**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHAIM DOV PRZEWOZMAN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | Civil Action No. 19-2601 |
| v. | ) | |
| | ) | |
| **ISLAMIC REPUBLIC OF IRAN, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**<u>PLAINTIFFS' RENEWED MOTION FOR DEFAULT JUDGMENT</u>**

1

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................. 1

II.  PROCEDURAL BACKGROUND ..................................................................... 2

III.  REQUEST FOR JUDICIAL NOTICE OF EVIDENCE PRESENTED IN RELATED PROCEEDINGS INVOLVING HAMAS AND PIJ .................................... 3

      A.  Under Federal Rule of Evidence 201, this Court can take judicial notice of previously-rendered conclusions of facts and law that establish Hamas's liability for acts of terrorism ........................................................ 3

      B.  This Court may render a liability judgment against FSIA defendants either by reviewing evidence considered in an opinion that is judicially noticed, or by adopting previous findings of fact and conclusions of law ......................... 5

      C.  Under Federal Rule of Evidence 201, this Court should take judicial notice of the numerous decisions finding that Iran materially supported Hamas and PIJ in their execution of acts of terrorism .................................................. 6

IV.  STANDARD FOR DEFAULT JUDGMENT ................................................... 8

V.  STATEMENT OF FACTS ................................................................................ 9

      A.  A Rocket Launched By Hamas and PIJ on May 5, 2019 Killed Pinches Przewozman and Caused Severe Emotional Distress to His Surviving Family Members ......................................................................................... 14

VI.  THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER THE IRANIAN DEFENDANT ................................................................................ 15

VII.  THE COURT MAY ASSERT SUBJECT MATTER JURISDICTION OVER THIS CASE ............................................................................................................... 16

      A.  Plaintiffs Injuries Were Caused By Acts of Extrajudicial Killings and Defendants' Provision of Material Support To Hamas .............................. 18

      B.  Defendants Were Designated As State Sponsors of Terrorism at the Time The Consolidated Actions Were Filed ............................................................... 20

      C.  Plaintiffs' Claims Meet the Requirements of 28 U.S.C. § 1605A(a)(2)(A)(ii) as Decedent Pinches Przewozman, the Victim of the Terrorist Attack, Was a Citizen of the United States ....................................................................... 20

      D.  Defendants Are Liable for Plaintiffs' Injuries ........................................... 21

            1.  Liability ............................................................................................... 21

i

**2. Damages** ............................................................................................ 27

    **A.   Plaintiffs Have Suffered Damages as a result of Defendants' Material Support For Hamas and PIJ** ............................................................... 27

    **B.   Plaintiffs' are Entitled to Compensatory Damages** ........................... 34

        **1. Estate of Pinches Przewozman – Survival Damages** ........................ 34

        **2. Family Members of Pinches Przewozman** .................................... 35

**E.   Plaintiffs Are Entitled to Punitive Damages** ....................................... 37

**VIII.   CONCLUSION** ................................................................................... 38

# **TABLE OF AUTHORITIES**

## Cases

*Acosta v. Islamic Republic of Iran*, 574 F.Supp. 2d 15 (D.D.C. 2008) ....................................................... 27

*Beer v. Islamic Republic of Iran*, 2010 WL 5105174 (D.D.C. 2010) .......................................................... 18

*Belkin v. Islamic Republic of Iran,* 667 F.Supp.2d 8 (D.D.C.2009) ............................................................ 37

*Ben Rafael v. Islamic Republic of Iran*, 718 F. Supp. 2d 25 (D.D.C. 2010) ................................................. 6

*Bennett v. Islamic Republic of Iran,*507 F. Supp. 2d 117 (D.D.C. 2007) ................................................ 7, 9

*Ben-Yishai, et al. v. The Syrian Arab Republic and the Islamic Republic of Iran*, 642 F.Supp.3d 110
(D.D.C. 2022) ........................................................................................................................................ 8

*Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1 (D.D.C. 2016) ............................................................ 9

*Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93 (D.D.C. 2012) ....................................... 6, 9, 19, 38

*Booth v. Fletcher,* 101 F.2d 676 (D.C. Cir. 1938) ................................................................................... 4, 5

*Borochov v. Islamic Republic of Iran*, 589 F.Supp. 3d 15 (D.D.C. 2022) ............................................. 23, 27

*Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64 (D.D.C. 2017) ....................................................... 35

*Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43 (D.D.C. 2009) .................................................. 6, 37

*Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, 2013 WL 351610 (D.D.C. 2013) ........... 4

*Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*, 811 F.
Supp. 2d 53 (D.D.C. 2011) .................................................................................................................... 4

*District of Columbia v. Coleman*, 667 A.2d 811 (D.C. 1995) .................................................................... 23

*Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97 (D.D.C. 2000) .......................................................... 9

*Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232 (D.D.C. 2012) ................................... 4, 8

*Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37 (D.D.C. 2012) ...................................... 4, 6

*Estate of Buoncore v. Great Socialist People's Libyan Arab Jamahiriya*, 942 F. Supp. 2d 13
(D.D.C.2013) ...................................................................................................................................... 22

*Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1 (D.D.C. 2011) .............................................. 4

*Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) ............................... 5, 34

*Ests. Of Ungar ex. Rel. Strachman v. Palestinian Auth.*, 304 F.Supp.2d 232 (D.R.I. 2004) ..................... 35

*Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236 (D.D.C. 2020) ....................................................... 9

*Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109 (D.D.C. 2012) ......................................................... 4

*Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015) .................................................. 36

*Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020) ..................................... 8, 24, 26, 27

*Fraenkel v. Islamic Republic of Iran,* 248 F. Supp. 3d 21 (D.D.C. 2017), rev'd in part on other grounds,
892 F. 3d 348 (D.C. Cir. 2018) ............................................................................................................ 25

*Goldstein v. Islamic Repub. of Iran*, 383 F. Supp. 3d 15 (D.D.C. 2019) .................................................... 34

*Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90 (D.D.C. 2006) ............................................... 6

*Haim v. Islamic Republic of Iran*, 425 F.Supp. 2d 57 (D.D.C. 2006) ....................................................... 27

*Hall v. Republic of Iraq*, 328 F. 3d 680 (D.C. Cir. 2003) ........................................................................... 8

iii

*Han Kim v. Democratic People's Republic of Korea*, 774 F. 3d 1044 (D.C. Cir. 2014)................................8

*In re Terrorism Litig.*, 659 F.Supp.2d 31 (D.D.C. 2009)...........................................................................19

*Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 2d 286 (D.D.C. 2015)...........................36, 38

*Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1 (D.D.C. 2020)...............................................................24

*Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 572 (7th Cir. 2012) ...........................................22

*Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16 (D.D.C. 2022)................................................34, 37

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51 (D.D.C. 2010)....................................................5

*Opati v. Republic of Sudan*, 60 F Supp. 3d 68 (D.D.C. 2014) .......................................................4, 5, 24

*Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44 (D.D.C. 2012)...............................................passim

*Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011) .........................................15, 18, 19

*Owens v. Republic of Sudan*, 864 F. 3d 751 (D.C. Cir. 2017) ....................................................................9

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) ..................................................................22

*Republic of Sudan v. Owens*, 194 A.3d 38 (D.C. 2018)............................................................................24

*Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010)...........................................5, 19

*Roth v. Islamic Republic of* Iran, 78 F. Supp. 3d 379 (D.D.C 2015) ..................................................passim

*Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105 (D.D.C. 2005) ...................................................9

*Selig v. Islamic Republic of Iran*, 573 F.Supp.3d 40 (D.D.C. 2021) ....................................................35, 37

*Shoham v. Islamic Republic of Iran*, 2017 WL 2399454 (D.D.C. 2017)..................................................22

*Spencer v. Islamic Republic of Iran*, 922 F. Supp. 2d 108 (D.D.C. 2013)..................................................4

*Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78 (D.D.C.2002)....................................................37

*Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1 (D.D.C. 2011) .......................................................4

*Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016)...................................................24

*Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010) ...................................................4

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010)................................................passim

*Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148 (D.D.C. 2009).............7, 9

*Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012) ............................................4, 8, 35

## Statutes

22 U.S.C. § 2705.........................................................................................................................................21

28 U.S.C. § 1602............................................................................................................................................2

28 U.S.C. § 1605A...................................................................................................................................passim

28 U.S.C. § 1608 (a)(3).............................................................................................................................2, 16

28 U.S.C. § 1608 (a)(4).............................................................................................................................2, 16

28 U.S.C. § 1608(a) .....................................................................................................................................15

28 U.S.C. § 1608(e) .....................................................................................................................................18

28 U.S.C. 1608 ...............................................................................................................................................8

28 U.S.C. 1608(c)(1) ....................................................................................................................................16

50 App. U.S.C. § 2405(j)(4) .........................................................................................................................20

**Other Authorities**

29 Am. Jur. 2d Evidence § 151 (2010) ................................................................. 4

Civil Wrongs Ordinance (New Version) § 19, 5728–1968, 2 LSI (New Version) 5 (1972) as amended (Isr.). ........................................................................................... 35

Restatement (Second) of Conflict of Laws .......................................................... 23

RESTATEMENT (SECOND) OF TORTS § 926 ..................................................... 34

**Rules**

Fed. R. Civ. P. 4 ................................................................................................... 15

Fed. R. Civ. P. 55 ................................................................................................... 8

**Regulations**

49 Fed. Reg. 2836-02 ........................................................................................... 20

## LIST OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| Ex. A | Expert Declaration of Dr. Matthew Levitt |
| Ex. B | Excerpts from U.S. Department of State, Bureau of Counterterrorism, Country Reports on Terrorism, 2019 |
| Ex. C | "Iran Allocates Yearly $70 Mln for Palestinian 'Jihad'" Asharq Al-Awsat (May 25, 2016) |
| Ex. D | Report of the Meir Amit Intelligence and Terrorism Information Center at the Israeli Intelligence Heritage and Commemoration Center (January 3, 2019) |
| Ex. E | "Outlaw Regime: A Chronicle of Iran's Destructive Activities", U.S. Department of State, Iran Action Group (2019) |
| Ex. F | "United States and United Kingdom Take Coordinated Action Against Hamas Leaders and Financiers" U.S. Department of Treasury, Press Release (November, 14, 2023) |
| Ex. G | "Ashdod man killed by rocket, raising death toll to 4, amid massive bombardment" Times of Israel (May 5, 2019) |
| Ex. H | State of Israel, Ministry of Defense, "Decision of the Certifying Authority according to Section 10 of the Compensation for Victims of Hostile Actions Law, 5730-1970 (May 30, 2019) with translation |
| Ex. I | Deposition Transcript of Chaim Przewozman |
| Ex. J | Deposition Transcript of Chaya Przewozman |
| Ex. K | Deposition Transcript of Hadassah Przewozman |
| Ex. L | Deposition Transcript of Sara Przewozman Rozenbaum |
| Ex. M. | Deposition Transcript of Yafa Przewozman Schechter |
| Ex. N. | Deposition Transcript of Zvi Yosef Przewozman |

Ex. O            U.S. Department of State, Consular Report of Birth Abroad for
                 Pinches Przewozman

Ex. P.           Compendium of Plaintiffs' Evidence of United States citizenship

Ex. Q.           Affidavit of Chaim Dov Przewozman

Ex. R            Affidavit of Chaya Rochel Przewozman

Ex. S            Affidavit of Hadassah Przewozman

Ex. T            Affidavit of Sara Przewozman Rozenbaum

Ex. U            Affidavit of Yafa Przewozman

Ex. V            Affidavit of Zvi Yosef Przewozman

Plaintiffs, come before this Court seeking a finding of liability and the entry of default judgment against Defendants the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS") and the Islamic Revolutionary Guards Corps ("IRGC") (collectively "the Iranian Defendants"), and in support thereof state as follows:

## I.    INTRODUCTION

This case arises from the murder of 21-year-old Pinches Przewozman during a May 5, 2019 rocket attack launched from the Gaza Strip into Israel. The attack that killed Pinches Przewozman was one of over 600 mortars and rockets launched by Hamas and Palestinian Islamic Jihad (PIJ) over the weekend of May 4-5, 2019. Hamas and PIJ, which received critical material support and direction from the Iranian Defendants specifically targeted civilian communities, hitting homes, a factory, a hospital, and a kindergarten, among other targets. *See* Exhibit A; Expert Report of Matthew Levitt, Ph.D. ("Levitt Report") at 41.

In the years leading up to the May 2019 attack, the Iranian Defendants, acting through their principals, aided and abetted and conspired with Hamas and PIJ to engage in acts of terrorism. Defendants provided this support to Hamas and PIJ with the knowledge and intent that such support would be used for terrorist attacks against Israeli and American interests.

In support of their claims, Plaintiffs have retained as an expert Dr. Matthew Levitt, who determined that there is sufficient evidence to opine that Hamas and PIJ were responsible for the May 5, 2019 rocket attack that killed Pinches Przewozman, and that the Iranian Defendants provided material support to Hamas and PIJ making the attacks possible. Dr. Levitt is a Senior Fellow and Director at the Washington Institute for Near East Policy. Dr. Levitt has frequently been recognized by this Court as an expert in Hamas and Iranian state sponsorship of

terrorism.

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign Immunities Act, (FSIA), codified as 28 U.S.C. § 1602, *et seq*. Because of its longstanding support for international terrorists, including its specific and material support of violent militias in Iraq since at least 2004, Iran has forfeited its immunity to the claims brought in this matter under the Foreign Sovereign Immunities Act ("FISA"). *See* 28 U.S.C. § 1605A. For the reasons set forth more fully below, Plaintiffs are entitled to redress for their injuries under the FSIA.

## II.    PROCEDURAL BACKGROUND

On August 28, 2019, Plaintiffs, filed a complaint against the Islamic Republic of Iran ("Iran"), asserting claims for compensatory and punitive damages under § 1605A(c) of the FSIA. [Dkt. 1].   An Amended Complaint was filed on October 9, 2019. [Dkt. 6]. ]. Plaintiffs attempted to effectuate service on Iran by sending two copies (along with translations) of the summons, complaint, and notice of suit to the Secretary of State for transmission to Iran via diplomatic channels. *See* 28 U.S.C. § 1608 (a)(4). [Dkt. 18]. Iran did not respond to Plaintiffs' complaint nor file any appearance before the Court in this action.   On February 26, 2021, the Clerk of Court entered Default as to Defendants. [Dkt. 21]. Plaintiffs filed their motion for default judgment as to liability on August 13, 2021 [Dkt. 23].

On September 19, 2022, the Court issued its Memorandum Opinion and Order denying plaintiffs motion for default judgment, without prejudice, and vacating the clerk's entry of default. [Dkt. 26 at 18].   The Court found that Plaintiffs could not effectuate service on the Defendants under 28 U.S.C. § 1608 (a)(4) because they had not first properly attempted to serve the Defendants by mail under 28 U.S.C. § 1608 (a)(3) and that deficiency was sufficient

to preclude the Court from exercising personal jurisdiction over the Defendants. [Dkt.26 at 18].

On December 30, 2022, plaintiffs filed their affidavits requesting the clerk mail a copy of the summons and complaint, and notice of suit, together with a translation, by registered mail, return receipt requested, to the Head of the Iranian Ministry of Foreign Affairs for each of the Defendants. [Dkt. 31,32,33].  The Clerk entered the certificate of mailing January 6, 2023. [Dk.35].   This attempt at service was unsuccessful. Plaintiffs thereafter properly effectuated service on Iran by sending two copies (along with translations) of the summons, complaint, and notice of suit to the Secretary of State for transmission to Iran via diplomatic channels. See 28 U.S.C. § 1608(a)(4). [Dkt. 42]. To date, Iran has not responded to Plaintiffs' complaint nor has it filed any appearance before the Court in this action.  On November 21, 2023, the Clerk of Court entered Default as to Defendants. [Dkt. 47].

As detailed further below, Plaintiffs respectfully submit that the Court issue a finding that Iran's material support for Hamas and PIJ enabled Hamas and PIJ to commit the terrorist attack that resulted in Plaintiffs' injuries.

### III.    REQUEST FOR JUDICIAL NOTICE OF EVIDENCE PRESENTED IN RELATED PROCEEDINGS INVOLVING HAMAS AND PIJ

#### A.  Under Federal Rule of Evidence 201, this Court can take judicial notice of previously-rendered conclusions of facts and law that establish Hamas's liability for acts of terrorism.

"Under Federal Rule of Evidence 201(b), courts may take judicial notice of facts 'not subject to reasonable dispute' that are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Opati v. Republic of Sudan*, 60 F Supp.

3d 68, 73 (D.D.C. 2014) (noting that "Courts in this district have done so frequently in the FSIA

context") (citing *Booth v. Fletcher,* 101 F.2d 676, 679 n.2 (D.C. Cir. 1938); 29 Am. Jur. 2d

Evidence § 151 (2010)). It is well established that courts may reach their own independent findings

of fact based on judicial notice of evidence presented in earlier related proceedings. *Id.* (granting

a motion for a default judgment where plaintiffs "rely solely" on "judicial notice of related

proceedings and records in cases before the same court.") (quoting *Valore v. Islamic Republic of

Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010)); *see also Estate of Botvin v. Islamic Republic of Iran*,

873 F. Supp. 2d 232, 237 (D.D.C. 2012) ("the proper approach is one 'that permits courts in

subsequent related cases to rely upon the evidence presented in earlier litigation . . . without

necessitating the formality of having that evidence reproduced.'"). As the Court has previously

noted "in the FSIA context" the courts of this circuit frequently take judicial notice of evidence

presented in past judicial proceedings arising out of the same terrorist attack. *Opati,* 60 F. Supp.

3d at 73. [1]

---

[1] *See, e.g.*, *Spencer v. Islamic Republic of Iran*, 922 F. Supp. 2d 108, 109 (D.D.C. 2013) ("Courts may also
take judicial notice of evidence presented in other related cases, including those where defendants failed to
enter an appearance.") (citing *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 59); *Buonocore v.
Great Socialist People's Libyan Arab Jamahiriya*, 2013 WL 351610, at *71 (D.D.C. 2013) *vacated in part
and modified in part*, 2013 WL 653921 (D.D.C. 2013); *Estate of Brown v. Islamic Republic of Iran*, 872 F.
Supp. 2d 37, 40 (D.D.C. 2012) (accepting "the issue of liability as [having] been [entirely] settled" by the
court's judicial notice of "the findings of fact and conclusions of law in [a previous case] with respect to all
issues of liability"); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 29 (D.D.C. 2012); *Fain v. Islamic
Republic of Iran*, 856 F. Supp. 2d 109, 115 (D.D.C. 2012) ("Because of the multiplicity of FSIA-related
litigation, courts in this District have frequently taken judicial notice of earlier, related proceedings.");
*Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*, 811 F. Supp.
2d 53, 73 (D.D.C. 2011); *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 6 (D.D.C. 2011); *Estate of
Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 15 (D.D.C. 2011); *Haim v. Islamic Republic of Iran*,
784 F. Supp. 2d 1, 6 (D.D.C. 2011); *Baker v. Socialist People's Libyan Arab Jamahiriya*, 775 F. Supp. 2d
48, 77 (D.D.C. 2011), *appeal dismissed by defendants*, 2011 WL 5515579 (D.C. Cir. 2011); *Valencia v.
Islamic Republic of Iran*, 774 F. Supp. 2d 1, 7 (D.D.C. 2010); *Oveissi v. Islamic Republic of Iran*, 768 F.
Supp. 2d 1, 6 (D.D.C. 2010); *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010);
*Ben-Rafael v. Islamic Republic of Iran*, 718 F. Supp. 2d 25, 31 (D.D.C. 2010) *Brewer v. Islamic Republic*

This Court can take judicial notice of evidence in the judicial records of related cases because "the judicial records 'establishing the type and substance of evidence that was presented to earlier courts' [are] 'not subject to reasonable dispute.'" *Opati v. Republic of Sudan*, 60 F. Supp. 3d at 73 (quoting *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010) (citing Fed. R. Evid. 201(b)); *Oveissi v. Islamic Republic of Iran,* 879 F. Supp. 2d 44, 50 (D.D.C. 2012); *Valore v. Islamic Republic of Iran*, 700 F. Supp. at 59; *see Booth v. Fletcher*, 101 F.2d at 679 n.2 ("A court may take judicial notice of, and give effect to, its own records in another but interrelated proceeding . . . ."). "The objective issue of what the evidence was—rather than the subjective determination of what the evidence means—is thus a proper exercise of judicial notice." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d at 172.

> **B. This Court may render a liability judgment against FSIA defendants either by reviewing evidence considered in an opinion that is judicially noticed, or by adopting previous findings of fact and conclusions of law.**

Although "courts generally cannot take notice of findings of fact from other proceedings *for the truth asserted therein* because these are disputable and usually are disputed... the FSIA does not require this Court to re-litigate issues that have already been settled" in previous decisions. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58 (D.D.C. 2010) (emphasis added). "Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Id*. In more than a dozen terrorism exception cases, this Court rendered default judgment against FSIA defendants by finding facts and making legal conclusions anew based on the evidence considered in judicially noticed

---

*of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 263 (D.D.C. 2006); *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 155 (D.D.C. 2006) (taking judicial notice of "findings made in a prior case arising from the same attack.")

opinions.

This Court has held that a terrorist organization committed an act of terrorism based solely on "adopting" prior decision's findings of fact and conclusions of law "in their entirety." *See, e.g.*, *Oveissi*, 768 F. Supp. 2d at 7; *Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d at 40 (accepting "the issue of liability as [having] been [entirely] settled" by the court's judicial notice of "the findings of fact and conclusions of law in [a previous case] with respect to all issues of liability"); *Ben Rafael v. Islamic Republic of Iran*, 718 F. Supp. 2d 25, 31 (D.D.C. 2010)("Based on prior [findings and holdings] in *Ben-Rafael I*, 540 F. Supp. 2d at 43-51, the Court reaffirms its ruling that plaintiffs here established their claims "by evidence satisfactory to the court" and reenters default judgment as to defendant Iran."); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009).

In addition, this court has specifically found that Hamas committed certain acts of terrorism based on judicially noticed findings of fact and conclusions of law drawn from prior decisions. *See, e.g.*, *Roth v. Islamic Republic of* Iran, 78 F. Supp. 3d 379 (D.D.C 2015) (taking judicial notice of evidence received in *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 95 (D.D.C. 2006) and in *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) to find that Hamas committed the act of terrorism at issue); *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 96, 103 (D.D.C. 2012) (taking judicial notice of facts found in a prior proceeding to find that Hamas was responsible for a bus bombing).

### C. Under Federal Rule of Evidence 201, this Court should take judicial notice of the numerous decisions finding that Iran materially supported Hamas and PIJ in their execution of acts of terrorism.

This Court can take judicial notice of conclusions of liability entered in previous cases. The

Court has frequently concluded that Iran was liable for providing material support to Hamas for the express purpose of enabling Hamas to launch terrorist attacks resulting in the injury and/or murder of American citizens. This Court has also concluded that Iran was liable for providing material support to PIJ for the same purpose. This Honorable Court can conclude that Iran provided material support to Hamas and PIJ in carrying out the rocket attack that injured plaintiffs by taking judicial notice of the following decisions finding that Iran materially supported Hamas before and after May 5, 2019:

1. In *Roth v. Islamic Republic of Iran*, the court found that on August 9, 2001 Hamas was responsible for a terrorist attack at a Sbarro restaurant. 8 F. Supp. 3d 379 (D.D.C 2015). The court found Iran liable for the attack because it provided material support to Hamas as early as 1999. *Id.* at *9, *24 (finding that defendants (1) provided substantial support to Hamas through provision of money and training and (2) encouraged the escalation of terrorist activities, including against Israeli targets; that these acts have a reasonable connection to the at-issue attack ultimately carried out by Hamas; and that this is sufficient to establish proximate cause under the FSIA);

2. In *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148 (D.D.C. 2009) the court found that in October 1994, Hamas abducted and executed Nachshon Wachsman, a U.S. citizen residing in Israel. *Id.* at 151. The court found Iran liable for the attack because it provided material support to Hamas as early as 1992. *Id.* at 154 (finding that Iran's official foreign policy is to support terrorism by providing economic and training support to Hamas, that Iran funnels its financial support through its Ministry of Information and Security, and that Iran provides professional military and terrorist training through its Revolutionary Guard);

3. In *Bennett v. Islamic Republic of Iran*, the court found that on July 31, 2002, Hamas detonated a bomb on the campus of Hebrew Univ *Bennett v. Islamic Republic of Iran*,507 F. Supp. 2d 117, 121 (D.D.C. 2007). The court found Iran liable for the attack because it had "continuously" provided material support to Hamas. *Id.* at 123-24 (explaining that Hamas, aka the Islamic Resistance Movement, is an organization supported by Iran dedicated to waging a holy war employing terrorism with the object of seizing the leadership of the Palestinian people and asserting sovereignty and the rule of the Muslim religion over all of Palestine, including all territory of the State of Israel);

4. In *Schwartz v. Islamic Republic of Iran*, the court found that Iran provided material support in the form of arms, training, funds, and technology to Hamas from 1993 to at least 2019.

7

2020 WL 7042842 at *5 (D.D.C. Nov. 30, 2020).

5. In *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020),  the court found that Iran provided material support to PIJ until at least the end of 2014. *Id*. at 341. The court noted that there was evidence that Iran had been funding PIJ since as early as 1993, but its support increased as PIJ carried out more successful attacks in the early 2000s. *Id.* at 340.

6. In *Ben-Yishai, et al. v. The Syrian Arab Republic and the Islamic Republic of Iran*, the court found that since 1979 Iran has actively opposed Israeli interests through proxy forces, such as the PIJ, through encouraging and monetarily incentivizing them to kill Israeli civilians. *Ben-Yishai, et al. v. The Syrian Arab Republic and the Islamic Republic of Iran*, 642 F.Supp.3d 110, 120-121 (D.D.C. 2022).

7.  In *Belkin v. Islamic Republic of Iran*, the court found that Iran provided the PIJ not only with financing, but also with advanced military training and munitions technology. 667 F.Supp. 2d 8, 16 (D.D.C. 2009).

8. In *Wultz v. Islamic Republic of Iran*, the court found that since 1996 the PIJ has received and continues to receive funding through Iran for PIJ operatives to use in terrorist operations.  864 F.Supp. 2d 24, 29 (D.D.C. 2012).


## IV.    STANDARD FOR DEFAULT JUDGMENT

"Under the FSIA, a court cannot simply enter default judgment; rather, out of respect for the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim or right to relief by evidence that is satisfactory to the court." *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012); *see also* 28 U.S.C. 1608I. This standard is identical to the standard for entry of default judgment against the United States under Fed. R. Civ. P. 55(d). *See Hall v. Republic of Iraq*, 328 F. 3d 680, 683–84 (D.C. Cir. 2003) .

"When the Defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F. 3d 1044, 1047 (D.C. Cir. 2014) ; *see also*  (via sworn affidavits); *Salazar v. Islamic Republic of Iran*, 370 F. Supp.

2d 105, 109 n.6 (D.D.C. 2005) (by taking "judicial notice of related proceedings and records");
*Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 78 (D.D.C. 2006) (with or without a live
evidentiary hearing). In sum, evidence "satisfactory to the Court," may be provided at an
evidentiary hearing, but it can also consist of "sworn affidavits or declarations, prior judicial fact-
findings, and other documents submitted in accordance with the Federal Rules of Evidence." *Ewan
v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 242 (D.D.C. 2020).

In weighing the evidence, the trial court must consider Congress's stated purpose in
enacting § 1605A—to "compensate the victims of terrorism [so as to] punish foreign states who
have committed or sponsored such acts and [to] deter them from doing so in the future," *Kim*, 774
F. 3d at 1408 (citation omitted)—while simultaneously recognizing the difficulty in obtaining
"firsthand evidence and eyewitness testimony … from an absent and likely hostile sovereign,"
*Owens v. Republic of Sudan*, 864 F. 3d 751, 785 (D.C. Cir. 2017). Although "[t]he Court must
scrutinize the plaintiff's allegations," *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17
(D.D.C. 2016), it should also "accept as true the plaintiffs' uncontroverted evidence," *see Elahi v.
Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); *see also Bennett v. Islamic
Republic of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007), "including proof by affidavit,"
*Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 155 (D.D.C.
2009).[2]

## V.    STATEMENT OF FACTS

Dr. Levitt lays out in detail Iran's long and established history of providing material aid
and support to terrorist organizations. Ex.A; Levitt Report at 23-35. Since the Iranian revolution
in 1979, Iran has supported terrorist organizations and international acts of terrorism as an

instrument of its stated foreign policy goals. *Id.* at 29. Those terrorist organizations include Hamas and the PIJ which conducted the 2019 rocket attack that killed Pinches Przewozman. *Id.* at 28-31, 40-41. Iran very publicly finances Hamas and PIJ; provides rockets to Hamas and PIJ; and provides training to Hamas and PIJ on how to build rockets and mortars. *Id.* Hamas has bluntly stated that Iran is its primary backer and "has a role in arms and financial support." *Id.* at 40. Iran's material support of Hamas and PIJ continued through the 2019 rocket attacks that killed Pinches Przewozman. *Id.* at 41-44. As Dr. Levitt notes, "[i]t is clear that Hamas and PIJ—both Iranian terrorist proxy groups that enjoy Iran's material support—fired these rockets." *Id.* at 41.

In 2019, the United States Bureau of Counterterrorism found that the Iranian regime and its proxies "continued to plot and commit terrorist attacks on a global scale" while spending "as much as $700 million per year to support terrorist groups, including Hizballah and Hamas." *See* Exhibit B; United States Bureau of Counterterrorism; Country Reports on Terrorism 2019, at 2[2]. The Bureau of Counterterrorism determined that, "In 2019, Iran provided support to Hamas and other designated Palestinian terrorist groups, including Palestine Islamic Jihad (PIJ) and the Popular Front for the Liberation of Palestine-General Command. These Palestinian terrorist groups were behind numerous deadly attacks originating in Gaza and the West Bank, including attacks against Israeli civilians in the Sinai Peninsula. *Id*. at 199.

In August 2017, Hamas candidly stated that Iran was "the largest backer financially and militarily" of the Hamas military wing. Ex. A; Levitt Report at 32. Iran's support of Hamas flows through the IRGC. *Id.* at 32-33. Due to Iran's material support of terrorism in 2019, the United

---

[2] https://www.state.gov/wp-content/uploads/2020/06/Country-Reports-on-Terrorism-2019-2.pdf

States designated IRGC, including its Qods Force, as a Foreign Terrorist Organization (FTO), the first time such a designation has been applied to part of another government. Ex. B at 2. The United States remarked that this "unprecedented step reflected the Iranian regime's unique place among the governments of the world in its use of terrorism as a central tool of its statecraft." *Id*. at 3.

Iran's financial and material support is also crucial to the operations of PIJ. In 2016, a PIJ delegation traveled to Iran to meet with Iranian leaders to discuss PIJ's role in the Middle East. Exhibit C; Asharq Al-Awsat Article, May 25, 2016.  According to sources, IRGC commander Qasem Soliemani ("Soleimani") played an active role in structuring the armed wing of the PIJ. Id. Additionally, Soliemani agreed to provide $70 million to PIJ from the from the IRGC's treasury. Id.

In 2021, Ziad Al-Nakhaleh, Secretary General of the PIJ spoke to the Al-Alam Network in Iran about Soliemani's role in arming and training of PIJ and military factions in Israel.[3] According to Al-Nakhaleh, "nothing happened without [Soliemani]'s direct orders and supervision. Id. Iran, through Soliemani, delivered missiles and weapons to the PIJ which were used in attacks against Israel. Id.

In January 2019, four months before the attack on Plaintiffs, the Meir Amit Intelligence and Terrorism Information Center published a report highlighting Iran's support to PIJ. Exhibit D; Meir Amit Intelligence Report.  According to the report, Iran was the *only* country supporting the "Palestinian resistance" being waged by Hamas and the PIJ. Id. at 1 (emphasis added). Iran's support included the provision of weapons, money, technical knowhow for rocket manufacture,

---

[3] https://www.memri.org/tv/sec-gen-palestinian-islamic-jihad-ziad-nakhaleh-soleimani-supplied-rockets-used-attack-tlv

logistics, political guidance and training. Id. A PIJ leader admitted in an interview that some rockets fired at Tel Aviv had been manufactured in Iran while others were manufactured in the Gaza Strip based on intelligence provided by Iran. Id.[4]

A U.S. Department of State report "Outlaw Regime: A Chronicle of Iran's Destructive Activities" from September 2018 confirms that Iran was providing material support to Hamas and Iran in the years leading up to the attack. Exhibit E; U.S. Dept. of State Report "Outlaw Regime". The 2018 State Department report states that Iran, through the IRGC, supports several U.S. designated terrorist groups, including Hamas and PIJ, by providing training, weapons, and equipment. Id. at 9. The report notes that Iran provides "up to $100 million annually in combined support to Palestinian terrorist groups, including Hamas, PIJ, and the Popular Front for the Liberation of Palestine-General Command. Id. at 10; See also Ex. B: Country Report 2019 at 266 ("Iran also provides up to $100 million annually in combined support to Palestinian terrorist groups including Hamas and PIJ").

Iran uses key banks to facilitate the financing of the terrorist activities of Hamas and the PIJ.  Exhibit A, Levitt report at 32. In November 2018, the U.S. Treasury Department exposed a massive illicit financing network through which Iran worked with Russian companies to provide funds to the regime of Bashar al-Assad in Syria as well as Hamas.  *Id*. at 35.  These banks include the The Central Bank of Iran (Bank Merkazi), Bank Melli, and Bank Saderat which have all been tied to financing Hamas, either directly or through funding the IRGC and Hezbollah, which in turn pass on funds to Hamas. *Id*. at 32-33. Indeed, in 2019, Bank Merkazi was designated by the U.S.

---

[4] A U.S. Department of State report "Outlaw Regime: A Chronicle of Iran's Destructive Activities" from September 2018

Treasury Department for providing material support and financing to terrorist organizations. *Id*. at 33.

On November 14, 2023, The U.S. Department of the Treasury imposed sanctions on Hamas-affiliated individuals and entities stating that "Iranian support, primarily through its Islamic Revolutionary Guard Corps (IRGC), has enabled Hamas's and PIJ's terrorist activities, to include the transfer of hundreds of millions of dollars in financial assistance and furnishing both weapons and operational training." *See* Exhibit F; U.S. Department of Treasury; "United States and United Kingdom Take Coordinated Action Against Hamas Leaders and Financiers." This was the third round of sanctions targeting Hamas-affiliated individuals and entities since the October 7, 2023 terrorist attacks on Israel. *Id.* The designations involved key officials and mechanisms by which Iran provides support to Hamas and PIJ and included Nasser Abu Sharif, PIJ's representative in Iran and its primary financier and stated that Iran's IRCG has trained PIJ fighters to build and develop missiles in Gaza. *Id.*

Hamas has been designated by the United States as a foreign terrorist organization (FTO) since 1997. Exhibit A; Levitt Report at 5. In its 2019 Report on Terrorism, the United States Bureau of Counterterrorism noted that United States citizens have died and been injured in suicide bombings, rocket launches, IED attacks, and shootings committed by Hamas including the 2019 rocket attacks that killed Pinches Przewozman. *Supra* fn. 2 at 121-123.

Hamas and PIJ coordinated the 2019 rocket attacks out of a "Joint Operations Room of Resistance Factions." Exhibit A; Levitt Report at 42. PIJ and Hamas admitted responsibility for the attacks issuing a statement that "The Joint Chamber of the Palestinian Resistance Factions announced its responsibility for bombing the sites of the Zionist enemy and its' usurps in the Gaza

environs from Saturday morning, 29 Shaaban 1440 AH, corresponding to 04/05-2019 AD, until 06:00 PM, with dozens of missile bursts." *Id.* at 43.    Hamas and the PIJ announced that "The Death is Coming" in both Hebrew and Arabic.  *Id.* Because Hamas has control over the Gaza strip it also controls the rocket attacks of other militant groups, and those groups need permission from Hamas to launch rocket attacks against Israel. *Id.* at 43.  Hamas conceded responsibility for the rocket attacks stating that its "resistance factions" fired rockets at Israel, but claiming this was only done in self-defense. *Id.*

**A. A Rocket Launched By Hamas and PIJ on May 5, 2019 Killed Pinches Przewozman and Caused Severe Emotional Distress to His Surviving Family Members**

On May 5, 2019, Pinches Przewozman died after being struck by rocket shrapnel while running for cover in the coastal city of Ashdod, Israel. Exhibit G; Times of Israel Article (May 5, 2019). Pinches was a citizen of the United States at the time of his death. The Israel Ministry of Defense determined that Pinches Przewozman's death was the result of a hostile act. Exhibit H; Israel Ministry of Defense Certification. The immediate family members of Pinches Przewozman have submitted deposition testimony attesting to the emotional distress and injuries that they have suffered following his death. *See* Exhibits  I, J, K, L, M, N.

For the reasons stated above, Dr. Levitt is clear that Hamas and the PIJ with the material support of Iran are responsible for the death of Pinches Przewozman.  Plaintiffs, based on the above facts, by and through their undersigned counsel, respectfully move this Court to (1) enter Default Judgment against the Iranian Defendants on behalf of Plaintiffs, pursuant to the private cause of action found in 28 U.S.C. § 1605A(c).

## VI.    THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER THE IRANIAN DEFENDANTS

Courts may exercise personal jurisdiction over a foreign state where the defendant is properly served in accordance with 28 U.S.C. § 1608. *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 148 (D.D.C. 2011). The FSIA establishes the requirements for proper service upon a foreign state or a political subdivision. Fed. R. Civ. P. 4(j)(1). The FSIA prescribes four methods of service:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). The first two methods of service were not possible in this case as plaintiffs have no "special arrangement" for service with Iran and Iran is not a party to an

15

"international convention on service of judicial documents."

Plaintiffs attempt to serve the Iranian Defendants through 28 U.S.C. § 1608(a)(3), was unsuccessful. [Dkt. 31, 32, 33]. Accordingly, on June 28, 2023, Plaintiffs mailed two copies of the summons, complaint and notice of suit along with translations of each to the United States Department of State (to the attention of the Director of Special Consular Services) for service through diplomatic channels in accordance with 28 U.S.C. § 1608(a)(4). [Dkt. 41].

The United States Department of State confirmed on September 27, 2023, that Defendants, the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and the Iranian Revolutionary Guard Corps were served with the pleadings on August 28, 2023. [Dkt 42]. Additionally, the Iranian Defendants were served with a diplomatic note of transmittal that specifically stated:

> [U]nder U.S. law any jurisdictional or other defense including claims of sovereign immunity must be addressed to the court before which the matter is pending, for which reason it is advisable to consult an attorney in the United States. Otherwise proceedings will continue without an opportunity to present arguments or evidence.

22 F.R. 93.1(d). In the case of service under 1608(a)(4) "service shall be deemed to have been made…as of the date of **transmittal** indicated in the certified copy of the diplomatic note." 28 U.S.C. 1608(c)(1) (emphasis added).

## VII.    THE COURT MAY ASSERT SUBJECT MATTER JURISDICTION OVER THIS CASE

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., provides the exclusive basis for subject matter jurisdiction over civil actions against foreign state defendants. 28 U.S.C. §§ 1330, 1602-1611. A federal district court may obtain jurisdiction over

a foreign sovereign where one of the FSIA's enumerated exceptions applies.

The Defense Authorization Act for Fiscal Year 2008, ("Defense Authorization Act"), Section 1083, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008) revised the framework under which state-sponsored terrorism cases are brought by substituting 28 U.S.C § 1605A in place of 28 U.S.C. § 1605(a)(7). Significantly, 1605A created a federal statutory cause of action for those victims and their legal representatives against state sponsors of terrorism for acts committed by the State and its agents. Despite the significant changes in the law, however, the requirements for the Court to assert its subject matter jurisdiction over this case have not changed. *See* 28 U.S.C § 1605A(a)(1), (a)(2).

The requirements for subject matter jurisdiction under 28 U.S.C. § 1605A allow Plaintiffs to seek money damages for personal injury or death if the damages were caused by:

1. the providing of "material support or resources"[5] for an act of hostage taking, torture, or an extrajudicial killing;

2. engaged in by an official while acting within the scope of his office;

3. the defendant was a "state-sponsor of terrorism" at the time the act complained of occurred; and

4. the claimant or the victim was a "national of the United States."

28 U.S.C. § 1605A(a)(1), (a)(2). As set forth below, six of the Plaintiffs satisfy each of the requirements for subject matter jurisdiction. First, Defendants were designated as state sponsors

---

[5] 28 U.S.C. § 1605A(h)(3) defines "material support or resources" as "the meaning given that term in section 2339A of title 18." 18 U.S.C. § 2339A(b) defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel."

of terrorism at the time of the May 5, 2019 terrorist attack. Second, Plaintiffs' injuries were caused by acts of "extrajudicial killing" and the provision of "material support" to Hamas and PIJ. Third, six of the Plaintiffs were United States nationals at the time of the attack.

### A. Plaintiffs Injuries Were Caused By Acts of Extrajudicial Killings and Defendants' Provision of Material Support To Hamas.

Immunity under the FSIA is not appropriate where "money damages are sought against a foreign state for personal injury or death that was caused by an act of extrajudicial killing...or the provision of material support or resources for such an act if such an act or provision of material support or resources is engaged in by an official, employee or agent or such foreign state while acting within the scope of his or her office, employment or agency." 28 U.S.C. § 1605A(a)(1).[5]

Plaintiffs' proved beyond their burden under 28 U.S.C. § 1608(e) that the Iranian Defendants provided material support and resources to Hamas and PIJ for acts of terrorism, including extrajudicial killings. With the support of the Iranian Defendants, Hamas and PIJ killed several civilians, including Pinches Przewozman, and injured multiple others during the terrorist attacks over the weekend of May 4-5, 2019. It is undisputed that the May 5, 2019 terrorist attack that killed Pinches Przewozman "was planned by members of Hamas [and PIJ] and there has been no evidence that the attack was sanctioned by any judicial body – legitimate or otherwise." *Beer v. Islamic Republic of Iran*, 2010 WL 5105174 (D.D.C. 2010). Such acts of terrorism are contrary to the guarantees "recognized as indispensable by civilized persons." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 150 (D.D.C. 2011). Thus, the May 5, 2019 terrorist attack constitutes an "extrajudicial killing." *Id*.; *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 101 (D.D.C. 2012) (Hamas suicide bombing constitutes an extrajudicial killing).

The Court "has determined that 'the routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes providing material support and resources for a terrorist act within the meaning'" of the FSIA state-sponsored terrorism exception. *Rimkus v. Islamic Republic of Iran,* 750 F. Supp. 2d 163, 182-83 (D.D.C. 2010); *In re Terrorism Litig.,* 659 F.Supp.2d 31, 42 (D.D.C. 2009). "Thus, where a foreign state routinely funnels money to a terrorist organization, a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which the claim arises to satisfy his obligation under the statute." *Id.*

There is no "but-for causation requirement under the FSIA; proximate causation is sufficient." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 75 (D.D.C. 2010). Proximate cause may be established by a showing of a "reasonable connection" between the material support provided and the ultimate act of terrorism. *Owens*, 826 F. Supp. 2d at 151. Here, the expert report of Dr. Levitt establishes that the Iranian Defendants routinely provided financial assistance to Hamas and PIJ. The evidence proves that defendants: (1) provided substantial support to Hamas through provision of money and training; and (2) encouraged the escalation of terrorist activities against Israeli targets. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 394 (D.D.C. 2015) (finding that these same acts "have a reasonable connection to an attack carried out by Hamas in 2001). "This is sufficient for the relatively low proximate cause bar imposed by the FSIA." *Id.* at 394.

Under such circumstances, the Iranian Defendants may be held liable for the acts of Hamas and PIJ under the state-sponsored terrorism exception and the imposition of vicarious liability under 28 U.S.C. §1605A(c).

19

### B. Defendants Were Designated As State Sponsors of Terrorism at the Time The Consolidated Actions Were Filed.

Plaintiffs comply with 28 U.S.C. § 1605A(a)(2)(A)(i)(II) as each of the Defendants were designated state sponsors of terrorism at the time of filing. The term "state-sponsor of terrorism" is defined by statute at 28 U.S.C. § 1605A(h)(6):

> the term 'state sponsor of terrorism' means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism . . . .

Iran was formally designated a "state sponsor of terrorism" on January 19, 1984 in accordance with section 6(j) of the Export Administration Act of 1979 50 U.S.C. App. 2405(j), *see also* 49 Fed. Reg. 2836-02 (statement of Secretary of State George P. Schultz), and continues to this day to be designated as a state sponsor of terrorism.

Once a country has been designated as a state sponsor of terrorism, the designation cannot be rescinded unless the President submits to Congress a proper report, as described in the Export Administration Act ("EAA"). 50 App. U.S.C. § 2405(j)(4). Iran has never been taken off the list of state sponsors of terrorism, pursuant to the EAA. As the terrorist attack in this case occurred on May 5, 2019, the requirements set forth in 28 U.S.C. § 1605A(a)(2)(A)(i)(II) are satisfied.

### C. Plaintiffs' Claims Meet the Requirements of 28 U.S.C. § 1605A(a)(2)(A)(ii) as Decedent Pinches Przewozman, the Victim of the Terrorist Attack, Was a Citizen of the United States

In order to assert subject matter jurisdiction under 1605A either the victim or claimant must be a U.S. national, a member of the armed forces, or "an employee of the Government of

the United States, or of an individual performing a contract awarded by the United States Government" at the time of the act of terrorism. 28 U.S.C. § 1605A(a)(2)(A)(ii). The term "national of the United States" is defined by 8 U.S.C. § 1101(a)(22) and includes (1) "a citizen of the United States" and (2) a person who, though not a citizen of the United States, owes permanent allegiance to the United States.

Decedent Pinches Przewozman was a citizen of the United States when he was killed in the May 5, 2019 terrorist attack. *See* Exhibit O.  A valid United States passport and "Certificate of Birth Abroad" issued by the Secretary of State shall constitute conclusive proof of United States citizenship. 22 U.S.C. § 2705; *See also* 22 U.S.C. § 212 ("No passport shall be granted or issued to or verified for any other persons than those owing allegiance, whether citizens or not, to the United States.").

### D. Defendants Are Liable for Plaintiffs' Injuries

#### 1. Liability

Section 1605A(c) creates a federal cause of action for four categories of individuals: a national of the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor, or a legal representative of such a person. Plaintiffs Chaim Dov Przewozman, Zvi Yosef Przewozman, Sara Przewozman-Rozenbaum, Yafa Przewozman, F. P. Przewozman (a minor), A.M.P. Przewozman (a minor) and the Estate of Pinches Przewozman have federal causes of action since they are U.S. nationals. *See*, *e.g.*, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010); See Exhibit P, Q, T, U, V.

Although Hadassah Przewozman, Chaya Rachel Przewozman, and Y.P. Przewozman (a minor) do not have a substantive federal cause of action under Section 1605A(c), each of these

Plaintiffs are still entitled to seek recovery under applicable state law pursuant to the jurisdiction conferred by Section 1605A(a). See, e.g., *Owens v. Republic of Sudan*, 864 F.3d 751, 809 (D.C. Cir. 2017) ("Of course, in most cases brought under the new terrorism exception, the plaintiff need not rely upon state tort law" but "[t]his does not, however, imply that the Congress intended to foreclose access to state law by those who need it, as do foreign family members"); *Estate of Buoncore v. Great Socialist People's Libyan Arab Jamahiriya*, 942 F. Supp. 2d 13, 14 (D.D.C.2013) (plaintiffs in 1605A action without a federal cause of action "can nevertheless pursue 'pass through' claims under applicable state or foreign law, based on the waiver of sovereign immunity granted in § 1605A(a)(2)(A)(ii).")(*quoting Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 572, 572 n.6 (7th Cir. 2012)).

Section 1605A(c)'s private right of action has four basic elements. A plaintiff must prove:

> (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where
> (2) the act was committed, or the material support was provided, by the foreign state or agent of the foreign state, and the act
> (3) caused personal injury or death
> (4) "for which courts of the United States may maintain jurisdiction under this section for money damages."

*Shoham v. Islamic Republic of Iran*, 2017 WL 2399454, at *17 (D.D.C. 2017) (citing Section 1605A(a)(1), (c)).  Based on these facts, the estate of all direct victims and all of the U.S. citizen family members have established liability under 1605A(c).

Federal courts addressing FSIA claims in the District of Columbia apply the choice of law rules of the forum state. *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 840 (D.C. Cir. 2009). Under those rules, the District of Columbia employs a "'constructive blending' of the

'government interests' analysis and the 'most significant relationship' test" to determine which law to apply. *Oveissi*, 573 F.3d at 842 (looking to the factors in the Restatement (Second) of Conflict of Laws). In performing the governmental interest analysis, the Court must "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review." *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995). There are two sources of law that could apply in this case: the law of the forum, D.C. law, or the law of the Plaintiffs' domicile where the attack occurred, Israeli law.  Here, Israel has the strongest governmental interest and the most significant relationship, therefore Israeli law should apply to the claims of the three Israeli Plaintiffs.

Under the governmental interest analysis, Israel "has a strong interest in 'both deterring attacks within its sovereign borders and ensuring compensation for injuries to its Domiciliaries.'"  *Borochov v. Islamic Republic of Iran*, 589 F.Supp. 3d 15, 38 (D.D.C. 2022) (citing *Oveissi*, 573 F.3d at 842).  In this case, the attack occurred in Israel and the three Israeli Plaintiffs live there.  There is no evidence that any victim was targeted because of their relationship to the United States, to the contrary, in the statement issued after the attacks, Hamas and PIJ acknowledged bombing Israeli civilian communities. The governmental interest analysis favors Israeli law.

The most significant relationship test also favors Israeli law. The attack occurred in Israel, the place of the injury was Israel, the three family member Plaintiffs are citizens of Israel and are domiciled in Israel, and there is no legal relationship between the Plaintiffs and the Defendants, Hamas, or PIJ to consider.  *See Force v. Islamic Republic of Iran*, 474 F.Supp. 3d

23

323, 373 (D.D.C. 2020).  Analogous to the circumstances in *Force*, the events in this case occurred in Israel and the direct victim the three non-U.S.-national Plaintiffs claims are predicated on was a dual U.S.-Israeli citizen living in Israel. *See Force* at 373-374.  Accordingly, Israeli law should be applied to the non-U.S.-national plaintiffs in this case.

To prevail on an IIED claim, "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant, which (2) either intentionally or recklessly, (3) causes the plaintiff severe emotional distress." *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 76 (D.D.C. 2014). Although typically a plaintiff must also be "present at the time" of the injury, the presence requirement is waived in FSIA terrorism cases when a plaintiff is a "member[ ] of the injured victim's immediate family." *See Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1, 9 (D.D.C. 2020); *see also Republic of Sudan v. Owens*, 194 A.3d 38, 44 (D.C. 2018) (concluding that, under D.C. law, "when § 1605A applies, the need for the presence requirement does not").

Defendants are also liable in tort under Israeli law to Hadassah Przewozman, Y.P. Przewozman (a minor) and Chaya Rachel Przewozman. *See Force v. Islamic Republic of Iran*, 464 F. Supp. 3d. 323, 373-375 (D.D.C. 2020).  When applying foreign law, "the [C]ourt may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 44 (D.D.C. 2016) (quoting Fed. R. Civ. P. 44.1). The Court has previously outlined Israeli law as applied in the context of Iranian liability for a terrorist attack:

> The Israeli civil tort of negligence is codified in the Civil Wrongs Ordinance (CWO) at § 35, 2 LSI (New Version) 14–15 (1972); *see also Wultz*, 755 F.Supp.2d at 57–58. Negligence requires a finding of the same elements as U.S. law: duty, breach, causation, and injury. Shnoor Decl. ¶ 14; *Wultz*, 755 F.Supp.2d at 57–58. Duty under Israeli law is divided into "duty in fact and notional duty." *Wultz*, 755

F.Supp.2d at 58. "[E]very person owes a duty to all persons whom ... a reasonable person ought in the circumstances to have contemplated as likely in the usual course of things to be affected by an act, or failure to do an act." CWO § 36, 2 LSI (New Version) 15 (1972). A court asks if a reasonable person could have foreseen the likelihood of damage when determining duty-in-fact. *See Wultz*, 755 F.Supp.2d at 58. Furthermore, if a duty-in-fact exists but the risk of harm as it occurred was already "taken into account by normal society when engaged in a particular action," a defendant will not be liable under the tort of negligence. *Id.* at 58–59. Normative duty considers "whether a reasonable person ought, as a matter of policy, to have foreseen the occurrence of the particular damage." CA 145/80 *Vaknin v. Beit Shemesh Local Council* 37(1) PD 113, 125–26 (1982) (Isr.); *see also Wultz*, 755 F.Supp. 2d at 59.

*Fraenkel v. Islamic Republic of Iran,* 248 F. Supp. 3d 21, 39 (D.D.C. 2017), rev'd in part on other grounds, 892 F. 3d 348 (D.C. Cir. 2018).

In *Force, supra*, this Court, weighing liability under Israeli law in a series a terrorist attacks, found:

> *First,* duty of care under Israeli law is "sometimes divided between the conceptual duty of care and concrete duty of care." *Id*. at 5 (Schnoor Decl. ¶ 16). "According to Israeli tort law[,] a duty of care (both conceptual and concrete) is presumed to exist whenever a reasonable person could have foreseen that the conduct at issue could cause harm of the type alleged." *Id.* at 6 (Schnoor Decl. ¶ 17); *see also CWO*, § 36, 2 LSI (New Version) 15 (1972) ("[E]very person owes a duty to all persons whom . . . a reasonable person ought in the circumstances to have contemplated as likely in the usual course of things to be affected by an act, or failure to do an act."). The Court finds that the Israeli plaintiffs have demonstrated that Defendants were under a duty of care to Bracha Rivkin, Yehudah Glick, his foster children R.T. and T.T., Avraham Moses's step-siblings, and Shmuel Brauner's children because, as noted above, "their injuries were foreseeable consequences" of Iran and Syria's provision of material support to Hamas and PIJ. see Fraenkel, 248 F. Supp. 3d at 39.

> *Second,* "[a] breach of the duty of care occurs when a party with a duty fails to take 'reasonable precautionary measures.'" *Id.* (citation omitted). Far from taking precautionary measures, Iran provided Hamas and PIJ with financing, weapons and training; Syria provided them with a safe haven from which to procure those tools and plan attacks; both actively encouraged terrorist operatives to carry out attacks

against the civilian population of Israel.  The Court, accordingly, concludes that Defendants breached their duty of care to the Israeli plaintiffs.

*Third*, the "[c]ause in fact is generally determined in Israel according to the 'but for' test."  Dkt. 34 at 7 (Schnoor Decl. ¶ 21) (citations omitted).  And legal causation is met "[i]f a reasonable person could have foreseen that a harm of the kind that happened might happen."  *Id.* (Schnoor Decl. ¶ 22).  Both types of causation are satisfied here.  As noted above, Plaintiffs have demonstrated that, but-for the material support of Iran, Hamas and PIJ would not have had the economic resources or the training to carry out the attacks at issue.  So, too, with Syria; the safe harbor provided by Syria was necessary for both groups to develop the operational capacity to carry out these attacks.  And, it was certainly foreseeable that, by providing Hamas and PIJ material support and encouraging them to carry out terrorist attacks against civilians in Israel, Iran would cause serious injury or death to civilians in Israel and inflict mental and emotional anguish on their families.

*Finally,* the element of harm is defined by the CWO as "loss of life, or loss of, or detriment to, any property, comfort, bodily welfare, reputation, or other similar loss or detriment."  Dkt. 34 at 7 (Schnoor Decl. ¶ 23).

*Force v. Islamic Republic of Iran*, 464 F.Supp. 3d at 375.

Applying this standard, courts have routinely found that Iran is liable to family members of U.S. nationals killed or injured in terrorist attacks under Israeli law. Likewise, Plaintiffs Hadassah Przewozman, Y.P. Przewozman (a minor) and Chaya Rachel Przewozman have adequately demonstrated that "but for the support provided by Iran . . . Hamas would not have been able to develop into the cohesive, organized, and deadly organization that it is today." *Fraenkel*, 248 F. Supp. 3d. at 40. Accordingly, the Iranian Defendants are liable to Plaintiffs Chaya Rochel Przewozman, Hadassah Przewozman, and minor Y.P. Przewozman.

In considering damages, "[u]nder the FSIA, a solatium claim is indistinguishable from an IIED claim." *Valore v. Islamic Republic of Iran*, 700 F.Supp 2d 52, 85 (D.D.C. 2010) (citing *Heiser*

II, 659 F,Supp. 2d at 27 n. 4.).  "In determining the appropriate award of damages . . ., the Court may look to prior decisions awarding damages for intentional infliction of emotional distress as well as to decisions regarding solatium." *Id.* (citing *Acosta v. Islamic Republic of Iran*, 574 F.Supp. 2d 15, 29 (D.D.C. 2008) (citing *Haim v. Islamic Republic of Iran*, 425 F.Supp. 2d 57, 71 (D.D.C. 2006).  Plaintiffs request that if the Court finds the Defendants liable to the Plaintiffs, the court award damages based on the adopted standard amounts in this District for each type of Plaintiff. *See Borochov*, 589 F.Supp. 3d at 41.

### 2.  Damages

### A.  Plaintiffs Have Suffered Damages as a result of Defendants' Material Support For Hamas and PIJ

Each of the adult family members has submitted compelling evidence of an extremely close relationship with the victim.  They have each testified to acute suffering due to the circumstances of the attack that continue to cause them grief, and psychological and emotional trauma. The testimony reveals the deleterious effect the attack had and continues to have on their lives and their family.

Pinches Przewozman was the oldest son of Chaim Dov Przewozman and Chaya Rachel Przewozman. He was one of six children ranging in age from twenty-six to twelve.  He was married to Hadassah Przewozman and had a son who was fifteen months old.  Hadassah was pregnant with their second child at the time of the attack.  On the evening of May 5, 2019, Pinches had gone to the synagogue with friends.  They were returning home when the air raid siren sounded as a result of rockets being fired.  They sought cover in a nearby building, but Pinches was struck by shrapnel from one of the rocket or mortar explosions before they could

reach safety.  Exhibit Q; Israel Time Article; Ahdod man killed by rocket.  Pinches was taken to the Assuta Medical Center for treatment but was pronounced dead shortly after arrival. *Id*.

Rabbi Chaim Dov Przewozman ("Rabbi Przewozman"), Pinches father, was at home with his wife on the evening of the attack.  He received a call from a friend informing him that a rocket had fallen near a place to where his son had been and that he should come to Ashdod. Exhibit I at 10: 2-6.  On the way to the hospital, he continued to receive calls from family members, but no one was willing to tell him what had happened. *Id.* at 10: 19-24.  He called a special number dedicated to news and updates and learned that a married yeshiva student had been injured and died. *Id*. at 11: 1-4.  That was when he realized his son had been killed. *Id.* at 11: 5-6. "We started to cry, my wife and I." *Id.*

Rabbi Przewozman stated in his deposition that "I never understood what it would mean to lose a son, and I don't understand how it is possible to have such terrible pain in the human heart.  It's a completely different world of very, very profound pain.  It feels like part of me is buried in the earth." *Id*. at 16: 23-25, 17: 1-3.  For six months after Pinches death, he was unable to cope with what had happened. *Id*. at 18; 14-17.  He "was completely out of the picture" and could not do anything or concentrate on anything. *Id*. at 18: 22-23.  He sought the help with a clinical therapist which he was continuing to see as of August 2021.  *Id*. at 18: 18-21.  Rabbi Przewozman testified that "pain has become an integral part of my personality.  I feel things differently today. I'm less able to feel emotion.  I'm less able to feel joy, to feel love." *Id*. at 19: 25, 20: 1-4.  He and his wife had a very close relationship with Pinches.  There was a mutual trust and a mutual love between them. *Id*. at 22: 17-19.  He stated that they helped Pinches in every way they could "with all our hearts."  *Id*. at 22: 20-21.  Pinches saw his mother and father

frequently even after his marriage, especially on weekends and holidays. *Id*. at 23:1-25.

Rabbi Przewozman stated that he believes his son's death changed his wife's life even more than his. *Id*. at 30:18-20. It has damaged her emotionally and affected her relationships with him, their children, and her friends. *Id*. at 31: 4-14. He said that "[t]he light has gone out of her eyes in her feelings." *Id*. at 31: 24-25. He testified that he has also observed the pain of the loss of a brother and the adverse impact it has had in all his children. *Id*. at 33: 4-25, 34: 14-24, 35: 2-13, 36: 1-10, 38: 1-17. Rabbi Przewozman stated that "[m]y life . . . is now divided into two parts, before and after, and after it's a completely different life . . . . I don't think anyone can understand unless they go through it. And I hope no one else has to go through it." *Id*. at 17: 11-16.

Chaya Rachel Przewozman is the mother of Pinches Przewozman. She described the mourning period after his death as a "black nightmare." Exhibit J at 12: 8. She said they felt it was the . . . tragedy of the whole Jewish people." *Id*. at 12: 9-10. She was very close to Pinches. *Id*. at 14: 5. She said he was "full of life and vitality and joy, and that he loved to help at home . . . he especially loved to be in the kitchen." *Id*. at 14: 10-12. Mrs. Przewozman feels that her life is completely different now and that there is no point in putting any effort into anything because it can "disappear in a moment." *Id*. at 15: 1-5. She is no longer able to work and says that she takes less interest in what happens to her two children who are still at home. *Id*. at 15: 18-25. She stated she has lost "the whole joy of my life, the whole point of living. I cry all the time. I function on a much lower level." *Id*. at 16: 21-23. Pinches death has had devastating effect on her emotions. She says that she is no longer able to "love my children and my husband the way I did before . . . I don't feel something inside." *Id*. at 17: 12-14. On the date of her

deposition in August 2021, she was seeing a psychotherapist once a week and taking medication for depression.

Mrs. Przewozman has observed that her husband is much sadder since their son's death. He cries frequently whereas he never cried before. *Id*. at 18: 24-25. He also has trouble sleeping. *Id.* at 18:25. She stated that after Pinches death, A.M.P., her son, was very unfocused and that his behavior resembled sleepwalking. *Id.* at 20: 23-25. She thinks that his new efforts to help, especially in the kitchen, demonstrate that he feels he must take on the role of Pinches. *Id.* at 21: 11-14. With respect to her daughter, F.P., she thinks she is "a child filled with anxiety. She is a very anxious child. She has a lot of fears. She is afraid of a lot of different things, and she doesn't want to come to Ashdod to visit my Mother-in-law. If we go to Ashdod, she is afraid to leave the house." *Id.* at 21: 21-25, 26: 1-2. F.P. told her mother "I'd like to talk to you about Pinches, about losing him, but I don't want to talk to you because if I talk to you, you'll start crying. And I don't want to see you crying." *Id.* at 22: 17-20.

Mrs. Przewozman concluded her deposition by saying "[m]y life is completely different. I'm not able to feel happiness, to love, or to function the way I did before. I feel like I have this pain inside." *Id.* at 25: 7-10

Hadassah Przewozman is Pinches widow. Hadassah was pregnant at the time of the attack. She gave birth to a son, P.P., four and a half months later. Exhibit K at 18: 17.[6] She stated that in

---

[6] While an unborn child is not entitled to recover solatium damages under §1605A or Israeli law, the fact that Hadassah Przewozman was pregnant at the time of her husband's death is relevant to the damages she suffered as a result of his loss. As she testified during her deposition, the depths of her emotional distress and injury is heightened knowing that her youngest child will never meet his father.

"one day everything came crashing down.  My whole world was destroyed, and I didn't know how I could continue. I miss him every single day all day.  And I can't fall asleep." *Id.* at 21:20-23. She stated that her older boy, Y.P., needs a father figure and it is very difficult. *Id.* at 23: 18-19. He is in kindergarten and most of the children are dropped off by their fathers.  When she took him to school he did not want to go in because he was with his mother. *Id.* at 24: 11.  He told her if Saba takes me, my grandfather, then I will go.  She stated that "his eyes looked so sad when he looked at the other fathers." *Id.* at 24: 14-17.

Hadassah still experiences anxiety and is very frightened especially when she hears sirens. *Id.* at 26: 19.  She states that "it just brings everything back immediately. It all flashes before my eyes once again, and it's – I'm always afraid that it's all going to come back to me and I'm going to have to live through that terrible day again." *Id.* at 27: 13-17.  When the feelings and emotions of that day do come back, she describes it as overwhelming. *Id.* at 28:1.

Sara Przewozman Rozenbaum is Pinches older sister.  Sara stated that of all the siblings, Pinches was closest to her and stated "I loved him very much, and even though he was younger than me, I looked up to him."  Exhibit L at 19: 1-7.  After Pinches died, Sara went through a difficult time with little sleep, little interest in things, lack of interest in returning to work and frequent crying. *Id.* at 20: 12-17.  At her deposition over two years after the attack, Sara said "[t]oday too in a certain place I feel things interest me less. I have . . . difficulties with my memory. I have difficulty concentrating and that effects the quality of my work.  I have fear and less patience, and, in general, I just feel restless.  And I just don't feel right, completely calm like I used to, and things aren't good." *Id.* at 21: 1-11.  She stated that she had none of these problems before her brother died. *Id.* at 31: 2.

31

Sara has observed that her younger brother, A.M.P., is more restless since Pinches death. *Id.* at 23:3.  He appears very restless and she said she never sees him calm and tranquil.  *Id.* at 23: 5-6.  She stated that he doesn't have any peace and quiet.  *Id.* at 23: 6-7.  Her sister, F.P., who is very bright, began having trouble in school after the attack. School is not as important to her anymore, it is less meaningful.  *Id.* at 23: 17-21.  Sara believes part of the difficulty the children are having relates to the fact that they now live in a much sadder environment with their parents, who themselves are less engaged in life than they were prior to the attack that killed her brother. *Id.* at 24: 6-12.

Yafa Przewozman Schecter is one of Pinches younger sisters.  Yafa described a close relationship with Pinches.  She stated that they used to play games together and that when he went to Yeshiva and came home on the weekends, they would sit and talk together and eat together and discuss things that were going on in their lives.  Exhibit M at 16:19-25.  After he got married and would visit on the weekends, they would sit on Friday nights and talk. *Id.* at 17: 1-3.  Yafa said Pinches "was very, very helpful to everyone. He would treat everyone really, really nice.  He always had good things to say to everyone."  *Id.* at 17: 8-10.

After Pinches died, Yafa testified that life did not go back to normal and that she was thinking about him all the time.  *Id.* at 13:17-18.  She had been studying to become a graphic artist, but after his death, she was not able to concentrate, had trouble listening, and could not complete her projects.  *Id.* at 14: 4-20.  She was offered a job as a secretary and just decided to start working.  *Id.* at 15: 5-18.  In her deposition, Yafa testified that she has "trouble falling asleep. Sometimes thoughts fill my head, especially after I meet with Hadassah and the children.  I also . . . take less interest.  I care less about things that I cared about before."  *Id.* at 24: 15-19.  She

also stated that she feels fearful when she sees Arabs or when she hears them speaking in their language. *Id.* at 24: 5-7.

Yafa stated that "[s]ince Pinches death [A.M.P.] has been very much involved in doing things just like Pinches did." *Id.* at 23: 3-4. He wants to be like Pinches much more than before including his work at yeshiva. A.M.P. would say "this is the exam Pinches took. So I want to take it." *Id.* at 23: 13-14. Yafa testified that it was not that way before. *Id.* at 23: 15. Yafe stated that her sister, F.P. is frightened and filled with anxiety now and that she was not that way before Pinches death. *Id.* at 23: 20-21. She stated that when they go to Ashdod for the weekend "she is afraid there is going to be a siren, an alert, and she afraid to be at home alone or go anywhere alone. She always has to have a friend with her or somebody else. It wasn't that way before." *Id.* at 23: 21-25.

Tzvi Yosef Przewozman is one of Pinches' younger brothers. Tzvi testified that he and Pinches "were very close in our childhood. We used to play a lot together. We would play the same games. We shared things. We would learn together. I would ask him questions. He was very smart. He was a Torah scholar." Exhibit N at 10: 2-8. After Pinches was married, he would come to Beit Shemesh for every second or third weekend and they "would meet in Jerusalem and travel to Jerusalem together." *Id.* at 11: 16-19. Tzvi stated that on the day of the attack he was at yeshiva studying with his brother A.M.P. and that he was told about the rockets hitting Ashdod and that Pinches had been injured so they walked home together." *Id.* at 15: 7-19. When he found out his brother had been killed he stated "it hurt a great deal and I was crying. I cried at the funeral and I cried before the funeral in the car on the way to Jerusalem." *Id.* at 17: 20-21. He stated "[m]y heart was torn out of my chest and I felt terrible." *Id.* at 18: 7-8. Since the attack, Tzvi

33

says he has changed.  He stated he is "afraid of Arabs.  I'm very suspicious.  And when there are sirens, there are air raids and things of that nature, I'm much more vigilant and interested in what happened and I have to know. . .if anyone was hurt.  And I sometimes I have trouble falling asleep. . . .especially if I've been crying" *Id.* at 23: 4-25.  Tzvi thinks that he is much more withdrawn since his brother's death and he has trouble concentrating so it is much harder for him to learn. *Id.* at 23: 14-16.  He stated that he has 'become very sensitive and frightened." *Id.* at 25: 3.

### B.  Plaintiffs' are Entitled to Compensatory Damages

"Assessing damages 'is an imperfect science.'" *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 35 (D.D.C. 2022); citing *Goldstein v. Islamic Repub. of Iran*, 383 F. Supp. 3d 15, 19 (D.D.C. 2019). "In the interest of fairness, however, courts strive to maintain consistency of awards" between plaintiffs in comparable situations. *Id*. "To achieve consistency, courts in this district have adopted standard amounts for each type of plaintiff." *Id*. Those figures originate from *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

### 1.  Estate of Pinches Przewozman – Survival Damages

A survival action accrues upon the death of an injured person and "limits recovery for damages for loss or impairment of earning capacity, emotional distress and all other harms, to harms suffered before the death." RESTATEMENT (SECOND) OF TORTS § 926. Courts have "awarded damages for the victim's pain and suffering that occurred between the attack and the victim's death shortly thereafter." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 79 (D.D.C. 2017).

The evidence establishes that Pinches Przewozman was seeking cover after Hamas and PIJ launched rockets from Gaza. Pinches was not killed from the immediate explosion of the

rocket but, rather, was struck by shrapnel after the explosion. Pinches was rushed to the hospital but later succumbed to his injuries.

Courts "typically award[ ] $1 million to a victim who survives a few minutes to a few hours after [the attack]." *Selig v. Islamic Republic of Iran,* 573 F.Supp.3d 40, 64 (D.D.C. 2021) quoting *Wultz v. Islamic Republic of Iran*, 864 F.Supp.2d 24, 37–38 (D.D.C. 2012). "In other words, a $1 million pain-and-suffering award is typically given to the estates of victims who quickly succumb to their injuries." *Id.* at 64. Under this framework, the Estate of Pinches Przewozman should be awarded $1 million in damages.[7]

### 2. Family Members of Pinches Przewozman

The family members of Pinches Przewozman are also entitled to recover for their injuries. Solatium, a form of compensatory damages, seeks "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent

---

[7] Hadassah Przewozman has standing to bring a survival action on behalf of Pinches's estate. Pinches's estate exists under Israeli law. "Israeli statutory law provides that a deceased tort victim's right to recover for injuries suffered during life passes to his or her estate. Civil Wrongs Ordinance (New Version) § 19, 5728–1968, 2 LSI (New Version) 5 (1972) as amended (Isr.)." *Roth v. Islamic Republic of Iran,* 78 F. Supp.3d 379, 398 (D.D.C. 2015). As the surviving spouse, Hadassah is an heir under Israeli law and is entitled to pursue a survival action on behalf of the estate. *Id*; See also *Ests. Of Ungar ex. Rel. Strachman v. Palestinian Auth*., 304 F.Supp.2d 232, 261 (D.R.I. 2004) ("Israeli law provides that when a decedent dies intestate the "legal heirs entitled to succession [are]: (1) Spouse of deceased; (2) children and their descendants and parents of deceased and their descendants." Martindale–Hubbell International Law Digest, Israel Law Digest, Estates and Trusts, Descent and Distribution at 8.").

experience as well as the harm caused by the loss of the decedent's society and comfort."[8] *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 2d 286, 290 (D.D.C. 2015); *Roth,* 78 F.Supp.3d 379, 402, 2015 WL 349208 at *15. Only immediate family members – parents, siblings, spouses, and children – are entitled to solatium awards. *Owens*, 71 F. Supp. 3d at 260. "Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish[,] ... and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages" for siblings. *Id.*

In terrorism actions brought pursuant to section 1605A of the FSIA, family members are not required to establish that they were present at the time of the incident in order to recover solatium damages. *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 80 (D.D.C. 2010)("One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result."). "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *Belkin v. Islamic Republic of Iran,* 667 F.Supp.2d 8, 22 (D.D.C.2009) (citing *Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 89 (D.D.C.2002)).

For the pain and suffering of relatives who were not present at the site of the attack, damages "must be determined by the nature of the relationship and the severity and duration of the pain suffered by the family member." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d, at 55. For a deceased victim, like Pinches, spouses typically receive $8 million. *Mark v. Islamic Republic of Ira*n, 626 F.Supp.3d at 35. The standard award for children and parents is $5 million while

siblings each typically receive $2.5 million in pain and suffering damages. *Selig v.  Islamic Republic of Iran,* 573 F.Supp.3d 40, 65 (D.D.C. 2021).

Plaintiffs request that the Court adopt the framework for determining solatium damages in this case and award the following damages:

| Plaintiff | Relationship to Pinches Przewozman | Damages |
|---|---|---|
| Estate of Pinches Przewozman | N/A | $1 million |
| Hadassah Przewozman | Spouse | $8 million |
| Chaim Dov Przewozman | Father | $5 million |
| Chaya Rachel Przewozman | Mother | $5 million |
| Y.P. Przewozman | Child | $5 million |
| Tzvi Yosef Przewozman | Sibling | $2.5 million |
| Sara Przewozman-Rozenbaum | Sibling | $2.5 million |
| Yafa Przewozman | Sibling | $2.5 million |
| F.P. Przewozman | Sibling | $2.5 million |
| A.M.P. Przewozman | Sibling | $2.5 million |

### E.    Plaintiffs Are Entitled to Punitive Damages

"Punitive damages are not meant to compensate the victim, but [are] instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." *Bodoff v. Islamic Republic of Iran*, 907 F.Supp.2d 93, 105

37

(D.D.C.2012); *quoting Oveissi v. Islamic Republic of Iran*, 879 F.Supp.2d 44, 56 (D.D.C.2012)). The determination as to the proper amount of punitive damages to award to a plaintiff is based on four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290-91 (D.D.C. 2015).

Courts in this District have consistently awarded punitive damages against the Iranian Defendants for providing material support and resources to Hamas. In awarding punitive damages, this Court has found that "defendants' material support for Hamas' terrorist activities is truly awful and worthy of gravest condemnation." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 406 (D.D.C. 2015). The harm caused by defendants' is among the worst imaginable – a terrorist attack aimed at innocent civilians, including children.

## VIII.   CONCLUSION

WHEREFORE, for the reasons set forth above, the Plaintiffs accordingly request that the court, taking notice of the expert Affidavit of Dr. Matthew Levitt submitted by Plaintiffs and the foregoing conclusions and judgments from related proceedings, enter default judgment against the Iranian Defendants, finding that Iran's material support for Hamas enabled Hamas to commit the May 5, 2019 attack on Ashdod that resulted in Plaintiffs' injuries. Plaintiffs further request that upon finding the Iranian Defendants liable, the Court consider awarding damages as set forth above.

Dated: December 24, 2023

Respectfully submitted,

/s David J. Dickens
David J. Dickens
The Miller Firm LLC
108 Railroad Avenue
Orange, VA 22960
Tel: (540) 672-4224

Allen L. Rothenberg, Esq.
D.C. Bar No. 328088
1420 Walnut Street, 2nd Floor
Philadelphia, PA 19102
Tel: (800) 624-8888

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of December 2023, a true and correct copy of the foregoing Plaintiffs' Motion for Default Judgment was filed electronically with the Clerk of Court using the CM/ECF system which will send a notification of such filing on all counsel of record.

/s/ David J. Dickens
David J. Dickens