## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHAYA RACHEL PRZEWOZMAN, *et al.*,

　　　　*Plaintiffs*,

　　v.

THE ISLAMIC REPUBLIC OF IRAN, *et al.*,

　　　　*Defendants*.

Civil Action No. 19-2601 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

This civil action for compensatory and punitive damages arises under the terrorism

exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.  The ten

Plaintiffs include the victim of a terrorist attack that took place in Israel on May 5, 2019, and his

family members.[1]  Most of the Plaintiffs are U.S. citizens, although some are not.  Defendants

are the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security

("MOIS"), and the Iranian Revolutionary Guard Corps ("IRGC").  Plaintiffs assert that their

injuries were caused by Iran's provision of material support to two terrorist organizations—

Hamas and Palestinian Islamic Jihad ("PIJ").

To establish subject-matter jurisdiction, Plaintiffs invoke the state-sponsored terrorism

exception to the FSIA, 28 U.S.C. § 1605A(a).  The seven U.S.-citizen Plaintiffs, *see* Dkt. 49 at

---

[1] Plaintiffs' initial complaint, Dkt. 1, listed ten plaintiffs, *see id.* at 3–4 (Compl. ¶¶ 5–13), but the amended complaint, Dkt. 6, added an additional plaintiff, P.P., the second son of Pinches Przewozman, *see id.* at 3 (Am. Compl. ¶ 8).  P.P., however, is not mentioned in any of the subsequent filings, including the motion for default judgment, Dkt. 49, except to explain why P.P's motion should receive a higher damages award.  The Court will therefore deny the motion for default judgment, without prejudice, as to P.P.

29, also rely on another provision of the statute to supply a federal cause of action:  They argue that Iran violated § 1605A(c) by providing "material support" to Hamas and PIJ, which, in turn, engaged in the extrajudicial killing of a U.S. national in the attack at issue.  Dkt. 6 at 5–10 (Am. Compl. ¶¶ 20–36).  Plaintiffs also assert claims for wrongful death, intentional infliction of emotional distress ("IIED"), loss of consortium, and aiding and abetting.  *Id.* at 10–13 (Am. Compl. ¶¶ 37–51).  None of the Defendants has answered or otherwise appeared in this action.  Consequently, at Plaintiffs' request, the Clerk of the Court entered defaults against all three Defendants.  Dkt. 47.

Plaintiffs subsequently moved for the entry of a default judgment against Iran, MOIS, and IRGC.  Dkt. 49.  As explained below, the U.S.-national Plaintiffs are entitled to recover against Iran under 28 U.S.C. § 1605A(c).  The Court further concludes that the non-U.S.-citizen Plaintiffs have established their right to relief under the law of Israel for negligence.  The Court will, accordingly, **GRANT** Plaintiffs' motion to enter default judgment against Iran, MOIS, and IRGC, *see* 28 U.S.C. § 1608(e), and will **APPOINT** a special master to hear their damages claims and to report to the Court recommending the appropriate award as to the Plaintiffs.

## I. INTRODUCTION

As discussed above, Plaintiffs, seven U.S. nationals (or their estates) and three non-U.S. nationals, bring this action for damages against Iran, MOIS, and IRGC.  They allege that Defendants provided material support and resources to Hamas and PIJ, which were used to carry out the terrorist attack on May 5, 2019.  Dkt. 6 at 2 (Am. Compl. ¶ 2).  That terrorist attack resulted in the death of Pinches Przewozman.  *Id.* at 10 (Am. Compl. ¶ 36).  Plaintiffs effected service on Iran, MOIS, and IRGC on August 28, 2023.  Dkt. 42.  None of the Defendants have answered, filed a motion under Federal Rule of Civil Procedure 12, or otherwise appeared.  *See*

Dkts. 43–45.  Accordingly, at Plaintiffs' request, the Clerk of the Court declared all Defendants in default on November 21, 2023.  *See* Dkt. 47.  Plaintiffs now seek entry of a default judgment with respect to liability against the Defendants pursuant to Federal Rule of Civil Procedure ("Rule") 55.  Dkt. 49.

Even in a garden-variety case, the entry of a default judgment "is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005), and requires the exercise of "sound discretion," *Boland v. Yoccabel Const. Co., Inc.*, 293 F.R.D. 13, 17 (D.D.C. 2013) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).  Most notably, the Court must—at a minimum—satisfy itself that it has subject-matter jurisdiction over the claims and personal jurisdiction over the defendants.  *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining that the Court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").

In cases brought against a foreign state, however, the Court's discretion to enter a default judgment is more narrowly circumscribed.  By statute, no federal or state court may enter a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  This is the same standard that applies to default judgments against the United States under Rule 55(d).  *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) ("*Owens IV*"), *vacated in part and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003).  In a case, such as this, alleging that a foreign state materially supported acts of terrorism, the district court must determine "how much and what kinds of evidence the plaintiff must provide."  *Han Kim v. Democratic People's*

*Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). But the Court must do so in light of Congress's purpose in enacting § 1605A—that is, to "compensat[e] the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *id.* at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002)) (first alteration in original)—and the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens IV*, 864 F.3d at 785. This means that, to obtain a default judgment against Iran, MOIS, and IRGC, Plaintiffs must (1) carry their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens IV*, 864 F.3d at 784; (2) establish that Defendants were served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) establish their right to relief under federal, *see* 28 U.S.C. § 1605A(c), or state law, *Owens IV,* 864 F.3d at 809 ("the pass-through approach remains viable"), by offering evidence "satisfactory to the court," 28 U.S.C. § 1608(e).

Here, Plaintiffs seek to carry this burden using two types of evidence: First, they have asked the Court to take judicial notice of the evidence, Dkt. 49 at 14–16, that was presented in *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117 (D.D.C. 2007); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009); *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148 (D.D.C. 2009); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 (D.D.C. 2015); *Schwartz v. Islamic Republic of Iran*, No. 18-1349, 2020 WL 7042842 (D.D.C. Nov. 30, 2020); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020); and *Ben-Yishai v. Syrian Arab Republic*, 642 F. Supp. 3d 110 (D.D.C. 2022). Second, they have submitted an expert declaration from Dr. Matthew Levitt, Dkt. 49-1 (Levitt Decl.), a former FBI analyst and senior

fellow at the Washington Institute for Near East Policy, whom this Court qualified in *Force* as an "expert on 'Iranian sponsorship of terrorism including Hamas and [PIJ],'" 464 F. Supp. 3d at 337.

In the course of reviewing the evidence, the Court has applied the Federal Rules of Evidence, but has done so based on the understanding, first, that it has "the authority— indeed, . . . the obligation—to 'adjust [evidentiary requirements] to . . . differing situations,'" *Han Kim*, 774 F.3d at 1048 (second and third alterations in original) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)), and, second, that the Court need not "step into the shoes of the defaulting party and pursue every possible evidentiary challenge," *Owens IV*, 864 F.3d at 785. Expert testimony, moreover, is not only entirely proper in FSIA cases, but often sufficient, *see id.* at 787–89, and even indispensable in "terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain," *id.* at 787. Whether through expert testimony or other competent evidence, though, the Court must ultimately determine whether Plaintiffs have "substantiate[d] [the] essential element[s] of jurisdiction" with admissible evidence. *Id.* at 786.

The Court now makes the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

In addition to submitting exhibits and a declaration from Levitt, Plaintiffs also ask the Court to take notice of the evidence presented in eight past cases to which the Islamic Republic of Iran was a party. The evidentiary presentation in one of these cases, *Force*, included testimony from five expert witnesses, including Levitt, and a dozen exhibits (including government reports). 464 F. Supp. 3d at 337. Although prior decisions in this district "have . . . frequently taken judicial notice of earlier, related proceedings," *Rimkus v. Islamic Republic of*

*Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010), that does not mean that the Court may simply accept the facts found in the earlier opinion, which would amount to a prohibited exercise of collateral estoppel, *see Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 20 (D.D.C. 2001) ("[F]indings of fact made during the course of this type of one-sided [FSIA] hearing should not be given a preclusive effect.").  The Court may, however, "review evidence considered in" a prior proceeding "without necessitating the re-presentation of such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010).  With that standard in mind, the Court has reviewed and considered the evidence presented in the eight cases for the purposes of this proceeding as well.

Based on that evidence and the declaration that Plaintiffs have submitted in this case, the Court finds as follows:  First, Iran provided Hamas and PIJ with significant support in the form of arms and financial assistance, as well as training and technical expertise.  Second, Hamas and PIJ jointly carried out the May 5, 2019, rocket attack, which resulted in the death of Pinches Przewozman.

## A.    Iran's Material Support to Hamas and PIJ

### 1.    *Overview of Iran's Proxy Strategy*

Since the Islamic Revolution in 1979, the Islamic Republic of Iran, led by its Supreme Leader, has actively opposed Israeli interests in the Middle East.  *Force*, No. 16-1468, Dkt. 32 at 7–8, 10–14 (Clawson Decl. ¶¶ 19, 27–28, 30).  One of the primary means by which Iran pursues this goal is by supporting non-state actors, including Hamas and PIJ, which share Iran's opposition to Israeli interests in the region.  *Id.* at 14 (Clawson Decl. ¶¶ 30–31); *see also Force*, No. 16-1468, Dkt. 31 at 10 (Levitt Decl. ¶ 19) (Hamas's opposition to Israel); *id.* at 46–47 (Levitt Decl. ¶¶ 90– 91) (PIJ's opposition to Israel).  Iran has also, at times, encouraged

individuals sharing Iran's goals of destroying the state of Israel to conduct "lone wol[f]" attacks and has offered money to the families of suicide bombers who terrorize Israeli civilians. *Force*, No. 16-1468, Dkt. 32 at 13 (Clawson Decl. ¶ 28). As a result, the United States has, since 1984, continuously designated Iran as a state sponsor of terrorism. *Id.* at 10 (Clawson Decl. ¶ 27).

2.    *Iran's Material Support to Hamas*

Hamas is both an acronym for "Harakat al-Muqawama al-Islamiya," which translates to "Islamic Resistance Movement," and is an Arabic word meaning "zeal." *Force*, No. 16-1468, Dkt. 31 at 10 (Levitt Decl. ¶ 19) (italics and internal quotation marks omitted). Founded in 1987, Hamas aims to "establish[] in [Israel's] place [ ] an Islamist Palestinian state." Dkt 49-1. at 6 (Levitt Decl.). Hamas "employs a three-pronged strategy to achieve this goal: (1) social welfare activity that builds grassroots support for the organization, (2) political activity that competes with the secular Palestinian Authority," and (3) "terrorist attacks that target Israeli soldiers and civilians." *Force*, No. 16-1468, Dkt. 31 at 10 (Levitt Decl. ¶ 19).

Hamas deploys a wide variety of types of attacks, "including bombings, rocket and mortar attacks, shooting attacks, stabbing attacks, kidnappings and attempted kidnappings[,] and car ramming attacks." Dkt. 49-1 at 12 (Levitt Decl.). While the intended goal is to terrorize the Israeli population, Hamas's attacks have killed individuals from around the world, including "from the United States, the United Kingdom, Ukraine, Romania, China, the Philippines[,] and Sweden." *See id.* (Levitt Decl.). "Without the significant funding it needs to carry out its terrorist, political, and social activities—which are interdependent and mutually reinforcing endeavors—Hamas could not function." *Id.* at 35 (Levitt Decl.). "Estimates of Hamas'[s] total annual budget range from $30 million to $90 million a year." *Id.* at 36 (Levitt Decl.)

Although the extent and nature of Iran's support for Hamas has varied over time, there is near-universal agreement that Iran has provided "critical" material support—in the form of cash, weapons, and training—for Hamas's terrorist activities since at least the mid-1990s. *Id.* at 35 (Levitt Decl.); *see also id.* at 23–24, 29 (Levitt Decl.); *Force*, No. 16-1468, Dkt. 32 at 14 (Clawson Decl. ¶ 30); Dkt. 49-1 at 28 (Levitt Decl.) (explaining that, even during a falling out over the Syrian civil war, "Iranian funding for Hamas never completely stopped"). Both Hamas and Iran have repeatedly acknowledged the support that Iran provides. *See, e.g.*, *id.* at 39–40 (Levitt Decl.) (collecting exemplary statements from Hamas leadership); *Force*, No. 16-1468, Dkt. 32 at 23–24 (Clawson Decl. ¶ 58) (quoting Supreme Leader Khameini saying that "Iran . . . aids Hamas . . . in Palestine"). Beyond finances and weapons, "Iran also provides logistical support to Hamas and military training to its members," and it oversees training camps in its own territory and in Lebanon for the purpose of training Hamas members. *Force*, No. 16-1468, Dkt. 31 at 29 (Levitt Decl. ¶ 58)) (citation omitted). Iran has provided this support through its instrumentalities, including MOIS, the Iranian intelligence service, *see* Dkt. 49-1 at 24 (Levitt Decl.), and the IRGC, an independent military branch that is charged with "protect[ing] the Islamic Republic" both in Iran and elsewhere, *Fritz v. Islamic Republic of Iran*, No. 15-cv-456, Dkt. 52 at 193–94 (Levitt). *See Greenbaum v. Islamic Republic of Iran*, No. 02-cv-2148, Dkt. 28-2 at 23 (Clawson Dep. 23:7–17) (noting that Iran provides material support to Hamas through the MOIS); Dkt. 49-1 at 26–27 (Levitt Decl.) (explaining that the IRGC both directly trains Hamas operatives who conduct terrorist attacks against Israel and it trains members of other groups, such as Hezbollah, who train Hamas operatives); *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 388–89 (D.D.C. 2015) (citing evidence that Iran provides material support to Hamas through MOIS); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258,

262 (D.D.C. 2003) (citing evidence that shows that "[u]nder the direction of MOIS," the IRGC provides professional military and terrorist training to Hamas).

Iran began providing financial and logistical support for Hamas in the 1990s because of "Hamas'[s] willingness to perpetrate terrorist activities and bus bombings"—attacks that Iran encouraged and praised. *Force*, No. 16-1468, Dkt. 32 at 14–15 (Clawson Decl. ¶¶ 35, 37). In these years, "Iran gave Hamas millions of dollars," which supported Hamas's terrorist activities, and "provid[ed] legitimate front activities behind which Hamas could hide its terrorist activities." *Id.* at 15 (Clawson Decl. ¶ 38); *see also* Dkt. 49-1 at 24 (Levitt Decl.) (summarizing different countries' estimates). During this period, Iran paid Hamas "generously" for successful terrorist attacks. *Force*, No. 16-1468, Dkt. 32 at 15 (Clawson Decl. ¶ 38). Iran also began smuggling rockets and weapons to Hamas in Gaza through tunnels between Egypt and Gaza. *Id.* at 19 (Clawson Decl. ¶ 50); Dkt. 49-1 at 27 (Levitt Decl.). Iran also specially designed rockets that could fit through these tunnels for the purposes of smuggling them from Egypt into Gaza. *Force*, No. 16-1468, Dkt. 32 at 19 (Clawson Decl. ¶ 51).

In 2006, Hamas won a plurality of seats in the Palestinian parliament, prompting "Iranian support, finances, and arms [to] r[i]se exponentially." *Id.* at 16 (Clawson Decl. ¶ 42). Israel's Intelligence and Terrorism Information Center reported that Iran "pledge[d] . . . $250 million to Hamas's Prime Minister Ismail Haniya in 2006 and 2007." *Id.* (Clawson Decl. ¶ 42). In 2007, the "Iran-Hamas relationship grew even closer after . . . Hamas took complete control of the Gaza Strip." *Id.* at 17 (Clawson Decl. ¶ 43). Around 2012, however, relations between Hamas and Iran cooled for several years as they took opposite sides of the Syrian Civil War, with Iran backing the Syrian regime led by Bashar al-Assad and Hamas supporting certain rebel groups. Dkt. 49-1 at 28 (Levitt Decl.). "[Y]et, Iranian funding for Hamas never completely

stopped," and even as Iran decreased its support for Hamas's political activities, its military activities were "not as badly affected." *Id.* (Levitt Decl.).

By 2014, relations with Iran had improved and Hamas found itself in an escalating conflict with Israel, during which many "of the arms Hamas deployed were the products of the Islamic Republic of Iran." *Id.* at 29 (Levitt Decl.) (quotation marks and citation omitted). That year, Israel intercepted a cargo ship believed to be headed to the Gaza Strip, carrying 40 M-302 rockets, 180 mortars, and approximately 400,000 rounds of ammunition, all "hidden in shipping containers" "with Iranian authenticity seals" "behind cement bags" "clearly marked as coming from Iran." *Id.* at 29–30 (Levitt Decl.). And, in 2015, Iran was reported to be sending literal "suitcases of cash . . . to Hamas's military wing in Gaza," *id.* at 32 (Levitt Decl.) (citation omitted), and was continuing to "provid[e] missile technology that Hamas used to construct its own rockets and [to] help[] [Hamas] rebuild tunnels destroyed in the conflict with Israel," *Force*, No. 16-1468, Dkt. 31 at 39 (Levitt Decl. ¶ 78) (citation omitted). According to Hamas's then newly elected leader in Gaza, Yihye Sinwar, Iran was once again "the largest backer financially and militarily" of the organization's military wing by 2017. Dkt. 49-1 at 32 (Levitt Decl.).

This strong support continued into 2019, the year of the terrorist attack that killed Pinches Przewozman. That year, the U.S. Treasury Department sanctioned the Central Bank of Iran "for its financial support to the IRGC," a group that "has provided material support to numerous terrorist groups, including . . . H[amas], and the Palestinian Islamic Jihad." *Id.* at 33 (Levitt Decl.) (quotation omitted); *see also* Dkt. 49-2 at 12 (explaining that "[i]n 2019, Iran provided support to Hamas"); Dkt. 49-5 at 10 (reporting in late 2018 that "Iran also provide[d] up to $100 million annually in combined support to Palestinian terrorist groups, including

Hamas").[2]  Accordingly, based on the unrebutted testimony offered by Plaintiffs' experts, the

Court finds that Iran provided material support in the form of arms, training, funds, and

technology to Hamas in the period leading up to the rocket attack in 2019.

3.    *Iran's Material Support to PIJ*

Palestinian Islamic Jihad ("PIJ"), or Al-Jihad Al-Islami fi Filastin, grew out of a

Palestinian student movement in Cairo led, most notably, by Fathi Shiqaqi.  *Force*, No. 16-1468,

Dkt. 31 at 46 (Levitt Decl. ¶ 90).  Shiqaqi, inspired by the 1979 Iranian Revolution, "believed

that a campaign of spectacular terrorist attacks against Israel in the name of revolutionary Islam

would inspire popular revolt" and lead to the destruction of Israel.  *Id.* at 47 (Levitt Decl. ¶ 93);

*see also id.* at 46 (Levitt Decl. ¶ 91).  PIJ began carrying out attacks—financed by "Iran's

mullahs"—against Israeli soldiers in the mid-1980s.  *Id.* at 47 (Levitt Decl. ¶ 93).  By the 1990s,

PIJ operatives were training at Iranian-backed Hezbollah camps in Lebanon, "under the

supervision" of Iranian Islamic Revolutionary Guards stationed in that country.  *Id.* at 48 (Levitt

Decl. ¶ 95).  PIJ executed "a deadly string of terrorist attacks" in Israel up until Shiqaqi's

---

[2] Under the public records exception to the hearsay rule, a "record or statement of a public office" is admissible if it contains "factual findings from a legally authorized investigation" and does not "indicate a lack of trustworthiness."  Fed. R. Evid. 803(8); *see also Owens IV*, 864 F.3d at 792.  Exhibit B is a Department of State report, entitled "Country Reports on Terrorism 2019," Dkt. 49-2 at 1, that is published annually in compliance with 22 U.S.C. § 2656f, which "requires the Department of State to provide Congress a full and complete annual report on terrorism," Dkt. 49-2 at 1.  The report is thus a public record for evidentiary purposes.  *See Owens IV*, 864 F.3d at 792 (finding that reports of the Department of State "fit squarely within the public records exception").  "Pursuant to the 'broad approach to admissibility' under Rule 803(8), a court may also admit 'conclusion[s] or opinion[s]' contained within a public record," and, "[o]nce proffered, a public record is presumptively admissible, and the opponent bears the burden of showing it is unreliable."  *Owens IV*, 864 F.3d at 792 (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 170 (1988)).  As the report contains summaries of lawful government investigations and bears no indicia of unreliability, the Court admits it into evidence under Fed. R. Evid. 803(8).  For the same reasons, the Court concludes that Exhibit E, which is a report from the Department of State's Iran Action Group entitled "Outlaw Regime: A Chronicle of Iran's Destructive Activities," Dkt. 49-5 at 1, is admissible.

assassination in October 1995, which created "a void in the organization so deep that," by 1997, "the group barely function[ed]." *Id.* at 50–51 (Levitt Decl. ¶ 101) (citation omitted). Following the collapse of Israeli-Palestinian peace talks in 2000, PIJ bomb makers and recruiters were released en masse from jail, leading to the group's resurgence. *Id.* at 51 (Levitt Decl. ¶ 102). From September 2002 to October 2003, PIJ "carried out over 440 terrorist attacks, including suicide bombings . . . , killing over 130 Israelis and wounding approximately 880 more." *Id.* (Levitt Decl. ¶ 103). The U.S. Department of State has designated PIJ as a foreign terrorist organization each year since 1997. *Id.* at 52–53 (Levitt Decl. ¶ 107).

There is evidence that Iran has been funding PIJ since as early as 1993, *id.* at 54 (Levitt Decl. ¶ 110), but Iran's support of PIJ increased as PIJ carried out more successful attacks in the early 2000s, *id.* at 53 (Levitt Decl. ¶ 108) (explaining Iran's promise to increase funding for PIJ by 70 percent in 2002 "to cover the expense of recruiting young Palestinians for suicide operations" (citation omitted)); *see also id.* ("Tehran instituted an incentive system in which millions of dollars in cash bonuses are conferred to [PIJ] for successful attacks."). In 2011, as the "wedge" was developing between Hamas and Iran over the Syrian civil war, Iran further increased its support for PIJ. *Id.* at 54–55 (Levitt Decl. ¶ 112).

Iran's support for PIJ has included "weapons, training, and funding." *Id.* at 55 (Levitt Decl. ¶ 112) (quoting U.S. Dep't of State, Bureau of Counterterrorism, Country Reports on Terrorism 2014 (June 2015)). In 2014, Israeli authorities intercepted a ship carrying mortars, bullets, and rockets "destined for Hamas and PIJ in Gaza" that were packed in containers featuring "seals of the Iranian postal company." *Id.* (citations omitted). This is consistent with PIJ's own spokesman's acknowledgment that "[a]ll of the weapons in Gaza are provided by Iran, be they weapons intended for the Hamas movement or for the PIJ." *Id.* (Levitt Decl. ¶ 113)

(citation omitted); *see also id.* at 56 (Levitt Decl. ¶ 15) (collecting statements confirming Iran's support for PIJ). In 2019, the year of the attack at issue, Iran continued to direct funding and resources to PIJ. *See* Dkt. 49-2 at 12; Dkt. 49-5 at 10.

**B.    May 5, 2019 rocket attack**

1.    *Killing of Pinches Przewozman*

On May 4 and 5, 2019, terrorist groups fired more than 600 mortars and rockets from the Gaza Strip into Israel. Dkt. 49-1 at 41 (Levitt Decl.). Bombardments throughout the weekend resulted in the deaths of numerous individuals, including Pinches Przewozman, *id.* (Levitt Decl.), who was a U.S. citizen, Dkt. 50-7 at 3–4. Przewozman was returning home from synagogue in Ashdod on the evening of May 5 when an air raid siren sounded. Dkt. 49 at 35. While seeking cover in a nearby building, Przewozman was struck with shrapnel from a rocket or mortar explosion. *Id.* at 35–36. He was transported to Assuta Medical Center and pronounced dead shortly after his arrival at the hospital. *Id.* at 36.

This case is brought on behalf of the estate of Pinches Przewozman, and his family members. His father, Chaim Przewozman; mother, Chaya Przewozman; siblings, Sara Przewozman-Rozenbaum, Yafa Przewozman, Zvi Przewozman, F.P. Przewozman, and A.M.P. Przewozman; wife, Hadassah Przewozman; and child, Y.P. Przewozman also seek damages for the "severe mental anguish[,] . . . pain[,] and suffering" they suffered as a result of his death, including loss of consortium. Dkt. 6 at 15 (Am. Compl. ¶ 63); *see also* Dkt. 49-17 (Chaim Przewozman Decl.); Dkt. 49-18 (Chaya Przewozman Decl.); Dkt. 49-19 (H. Przewozman Decl.); Dkt. 49-20 (S. Przewozman-Rozenbaum Decl.); Dkt. 49-21 (Y. Przewozman Decl.); Dkt. 49-22 (Z. Przewozman Decl.).

2.    *Attribution to Hamas and PIJ*

According to Dr. Matthew Levitt, an expert on Middle Eastern terrorist groups, including Hamas, "[i]t is clear that Hamas and PIJ . . . fired these rockets." Dkt. 49-1 at 1, 41 (Levitt Decl.). In support of his conclusion, he offers two observations.

*First*, and most significantly, the organizations took responsibility for the rocket attacks. Levitt explains that "Hamas and PIJ coordinated their military operations out of a 'Joint Operations Room of Resistance Factions.'" *Id.* at 41 (Levitt Decl.). The groups founded the Joint Operations Room in 2018 and published a flier with "pictures of rockets flying and destroying targets, reading: 'The Death is Coming' in both Hebrew and Arabic." *Id.* at 42 (Levitt Decl.). After the attacks on May 4, 2019, and May 5, 2019, PIJ released a statement in the name of "The Joint Chamber of the Palestinian Resistance Factions" claiming "responsibility for bombing the sites of the Zionist enemy and its usurps in the Gaza environs." *Id.* at 41 (Levitt Decl.). This document featured a list of bombardments, including "the bombing of occupied Ashdod" on the evening of May 5. *Id.* at 42 (Levitt Decl.). In response to these events, the U.N. Secretary General issued a statement "condemn[ing] . . . the launching of rockets from Gaza into Israel." *Id.* at 43 (Levitt Decl.). Hamas then published its own statement, acknowledging that the group's "resistance factions" had fired the rockets. *Id.* (Levitt Decl.).

*Second*, Hamas governs the Gaza Strip and "control[s] when other militant groups fire rockets" at Israel. *Id.* (Levitt Decl.). Hamas's anti-rocket patrol unit has "deployed to prevent other groups from firing rockets at Israel many times, including in 2011, 2013, and 2014." *Id.* (Levitt Decl.). Hamas therefore "bears responsibility for rockets it proactively allows other groups to fire at Israel" "even when [it] does not fire rockets itself." *Id.* (Levitt Decl.).

In light of the above, the Court concludes that Pinches Przewozman was the victim of a Hamas and PIJ terror attack.

### III.  CONCLUSIONS OF LAW

Under the Foreign Sovereign Immunity Act, 28 U.S.C. § 1604, a foreign state, including its instrumentalities, is immune from suit in state or federal court unless the case falls within an express statutory exception.  *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004).  For present purposes, the sole relevant exception is found in the state-sponsored terrorism exception, 28 U.S.C. § 1605A, which both confers subject-matter jurisdiction on federal district courts to hear certain terrorism-related claims, *see* 28 U.S.C. § 1330(a), and recognizes a federal cause of action against those foreign states subject to the exception, *see Owens IV*, 864 F.3d at 764.  The FSIA also addresses personal jurisdiction and specifies precise procedures that a plaintiff must follow—at times with the assistance of the clerk of the court and the U.S. Department of State—to effect service on a foreign state.  *See* 28 U.S.C. § 1608.

The Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear.  First, because the FSIA deprives courts of subject-matter jurisdiction in the absence of a relevant exception, a failure to appear does not waive the defense and the courts are "obligated to consider *sua sponte*" whether they have jurisdiction to hear the case and to order any relief.  *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (even where a defendant foreign state does not appear, the Court "still must determine that immunity is unavailable").  Second, with respect to the substance of a plaintiffs' state or federal law claims, as noted above, the FSIA precludes courts from entering a default judgment against a foreign state unless the court is

satisfied that the plaintiff has established her "right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Owens IV*, 864 F.3d at 784–86. And, because "the entry of a default judgment is not automatic," courts must "satisfy [themselves] that [they have] personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6 (footnote omitted).

Each of these inquiries, in turn, implicates a slightly different standard of proof. To establish subject-matter jurisdiction, an FSIA "plaintiff bears an initial burden of production to show [that] an exception to immunity, such as § 1605A, applies." *Owens IV*, 864 F.3d at 784. "Although a court gains jurisdiction over a claim against a defaulting defendant when a plaintiff meets his burden of production, the plaintiff must still prove his case on the merits." *Id.* To do so, the plaintiff must "establish his . . . right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This provision's "protection against an unfounded default judgment" does not altogether "relieve[] the sovereign from the duty to defend" but, nonetheless, requires that the plaintiff offer "admissible evidence" sufficient to "substantiate [the] essential element[s]" of her claim. *Owens IV*, 864 F.3d at 785–86 (quotations omitted). Finally, to establish personal jurisdiction over a defaulting defendant, the plaintiff must make "a prima facie showing of [personal] jurisdiction." *Mwani*, 417 F.3d at 6.

As explained below, the Court concludes that it has subject-matter jurisdiction over Plaintiffs' claims and personal jurisdiction over Iran, MOIS, and IRGC. The Court also concludes that the U.S. national Plaintiffs have carried their burden of establishing a right to relief under the federal cause of action established in § 1605A, and the Court concludes that the Israeli Plaintiffs have carried their burden of establishing a right to relief under Israeli law.

A.      **Subject-Matter Jurisdiction and Liability for § 1605A(c) Claims**

"[T]he [federal] district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief in personam with respect to which the foreign state is not entitled to immunity under" the FSIA.  28 U.S.C. § 1330(a).  The Court, accordingly, has subject-matter jurisdiction over the present "nonjury civil action" against Iran if, and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied. For the reasons that follow, Plaintiffs have carried their burden of establishing the Court's subject-matter jurisdiction.

Under the state-sponsored terrorism exception, 28 U.S.C. § 1605A(a)(1), a foreign state is not immune from the jurisdiction of the federal and state courts in cases in which:

> [(1)] money damages are sought against a foreign state [(2)] for personal injury or death [(3)] that was caused by [(4)] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [(5)] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  The exception, moreover, applies only to suits in which two additional requirements are met.  First, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred.  28 U.S.C. § 1605A(a)(2)(A)(ii).  Second, the foreign state must be designated as a state sponsor of terrorism both at the time the act occurred (or was so designated as a result of the act) and at the time the lawsuit was filed (or was so designated within the six-month period preceding the filing of the suit).  *Id.* § 1605A(a)(2)(A)(i)(I).

Several of the conditions for subject-matter jurisdiction are easily addressed in this case. First, Plaintiffs expressly seek only monetary relief, costs and expenses, and attorneys' fees.  *See* Dkt. 6 at 16 (Am. Compl.).  Second, Iran was designated as a state sponsor of terrorism in 1984,

*see* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz), and remains so designated to this day, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, available at https://perma.cc/U3C4-RW6F (last visited August 9, 2024).  Moreover, because the MOIS and IRGC are properly considered "an integral part" of the "foreign state[]" of Iran's "political structure," *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994)), and because § 1605A focuses on whether "the foreign state was designated"—and not whether each named defendant was separately designated—the Court concludes that the designation of Iran as a state sponsor of terrorism is sufficient to satisfy the designation requirement as to all three Defendants.  *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I).  Third, at the time the relevant acts occurred, the direct victim and six of his family members were U.S. nationals (the Court will address the Israeli national Plaintiffs below).  Dkt. 49 at 29.

As a result, the only substantial jurisdictional question left for the Court is whether Plaintiffs' claims are for "personal injury or death that [were] caused by . . . act[s] of torture, extrajudicial killing . . . hostage taking, or the provision of material support or resources" by an "official, employee, or agent of" Iran.  28 U.S.C. § 1605A(a)(1).  For the reasons explained below, the Court concludes as follows:  (1) Hamas and PIJ committed an act of "extrajudicial killing" within the meaning of the International Convention Against the Taking of Hostages and the Torture Victim Protection Act; (2) Iranian officials and their agents provided "material support or resources" for the extrajudicial killing that caused Plaintiffs' injuries within the meaning of 18 U.S.C. § 2339A; and (3) Iran's provision of material support caused the death of Pinches Przewozman.  Plaintiffs' claims against Iran, therefore, fall within the state-sponsored terrorism exception of 28 U.S.C. § 1605A(a)(1).

1.       *"Personal Injury or Death . . . Caused By" Defendants' Conduct*

The FSIA effects a waiver of sovereign immunity for claims seeking to recover for "personal injury or death that was caused by" certain terrorist acts or the provision of material support for such acts.  28 U.S.C. § 1605A(a)(1).  Plaintiff Pinches Przewozman died as a result of a terrorist attack committed by Hamas and PIJ, and his estate's claim to recover for that injury satisfies the personal injury requirement of § 1605A(a)(1).  Because the statute is understood to encompass claims by family members of those killed for the distress caused by their relative's injuries, also known as solatium actions, *see* 28 U.S.C. § 1605A(c)(4); *see also Salzman v. Islamic Republic of Iran*, No. 17-cv-1745, 2019 WL 4673761 at *12 (D.D.C. Sept. 25, 2019), the relatives of Pinches Przewozman also satisfy the personal injury requirement of § 1605A(a)(1).

2.       *Hamas and PIJ's Act of Extrajudicial Killing*

To fall within the FSIA's waiver of sovereign immunity, Plaintiffs' "personal injur[ies] or death[s]" must also have been "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  The FSIA looks to the Torture Victims Protection Act of 1991 ("TVPA") to define "extrajudicial killing."  28 U.S.C. § 1605A(h)(7).  Under the TVPA, "extrajudicial killing" means

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73.  As the D.C. Circuit has explained, this definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court."  *Owens IV*, 864 F.3d at

770.

To begin with, it is indisputable that the May 5, 2019, rocket attack, which resulted in the death of Pinches Przewozman, constitutes a killing.  *See Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 34 (D.D.C. 2012) (finding that a suicide bombing at a restaurant constituted an extrajudicial killing under the TVPA's definition); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 395 (D.D.C. 2015) (same); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 52–53 (D.D.C. 2009) (finding that a suicide bombing of a United States Embassy building constituted an extrajudicial killing).

Next, Plaintiffs must show that the attack that caused their injuries was "deliberated."  "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse."  *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) ("*Owens III*") (citing Webster's Third New International Dictionary 596 (1993); 4 The Oxford English Dictionary 414 (2d ed. 1989); Black's Law Dictionary 492 (9th ed. 2009)), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017), *vacated in part and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020).  Here, there is ample evidence that the attack in question was planned.  First, in November 2018, Hamas and PIJ's Joint Operations Room released a flier depicting rockets flying that read "The Death is Coming."  Dkt 49-1 at 42 (Levitt Decl.).  Second, according to Dr. Levitt, Hamas "work[s] to control when other militant groups fire rockets at Gaza" and "prevent[s] rockets from being fired at Israel at times when such activities might conflict with Hamas interests."  *Id.* at 43 (Levitt Decl.) (noting instances in 2011, 2013, and 2014 when Hamas's anti-rocket patrol unit prevented other groups from firing rockets).  Third, the May 5, 2019, attack was part of a coordinated rocket campaign, where Hamas and PIJ fired 690 projectiles during the course of a weekend.  *Id.* at 41; *see also, e.g.*, *Force*, 464 F.

Supp. 3d at 364 (finding a rocket attack by Hamas on Israel to be "deliberated" when the rocket at issue "was part of coordinated rocket campaign during a particularly active period of conflict with Israel").

Finally, there is no evidence whatsoever that the attack was authorized "by a prior judgment affording judicial guarantees o[f] due process," *Foley v. Syrian Islamic Republic*, 249 F. Supp. 3d 186, 202 (D.D.C 2017); *see also Owens IV*, 864 F.3d at 770, or that it was "lawfully carried out under the authority of a foreign nation," TVPA § 3(a).  To the contrary, Hamas and PIJ, non-state actors, claimed credit for the attack.  Dkt. 49-1 at 43 (Levitt Decl.).  And the Court credits Levitt's unrebutted conclusion that Hamas and PIJ were responsible.

The Court, accordingly, concludes that the attack at issue qualifies as an "extrajudicial killing" under 28 U.S.C. § 1605A(a)(1).

3.    *Iran's Provision of Material Support for Hamas and PIJ's Act of Extrajudicial Killing*

The FSIA's terrorism exception applies when a plaintiff seeks money damages for "personal injury or death that was caused by . . . the provision of material support or resources for" an "act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking," so long as that support was provided by "an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A(a)(1).  Section 1605A(h)(3) defines "material support or resources" by reference to 18 U.S.C. § 2339A, the criminal material support statute.  Section 2339A defines "material support or resources" to mean

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives,

personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

The Court has found that, during the years leading up to and surrounding the May 5, 2019 attack at issue, Iran provided tens—if not hundreds—of millions of dollars' worth of currency to Hamas and PIJ. *See supra* Part II.A. Iran also provided substantial operational capacity to both groups, including rockets and other weapons, weapons technology, and training of operatives. *See id*. The Court therefore concludes that Iran provided both Hamas and PIJ "material support" in the form of, *inter alia*, "currency," "training," "expert . . . assistance," and "weapons" within the meaning the FSIA. *See* 28 U.S.C. § 1605A(h)(3); 18 U.S.C. § 2339A(b)(1).

    4.    *Causation*

The Court must also consider whether Plaintiffs' injuries were "caused by" provision of material support to Hamas and PIJ. 28 U.S.C. § 1605A(a)(1). Plaintiffs need not show that Iran "specifically knew of or intended its support to cause" the particular attack in question, *Owens IV*, 864 F.3d at 798, or even that Iran's material support was a "but for" cause of their injures, *Kilburn*, 376 F.3d at 1128. Instead, the FSIA requires only a "showing of 'proximate cause,'" which is satisfied where a plaintiff can show "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Id.* (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)). This inquiry thus "contains two similar but distinct elements." *Owens IV*, 864 F.3d at 794. "First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury." *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). "Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Id.* (quoting same).

Plaintiffs have not offered direct evidence that Iran's support was tied to the attack that caused their injuries. But such a "nexus" is not necessary because funds—and, in certain instances, arms and other support—are fungible, and the FSIA could hardly be interpreted to condition Plaintiffs' recovery on Hamas and PIJ's "careful bookkeeping." *Kilburn*, 376 F.3d at 1130. Here, Plaintiffs have shown that Iran's financial and military aid to the two groups was essential to each group's operating capacity and that, without Iran's backing, both groups would be substantially weakened. *See supra* Part II.A. Thus, Iran's support to both PIJ and Hamas was a substantial factor in the rocket attack that caused Plaintiffs' injuries.

This, then, leaves the question whether Plaintiffs' injuries resulting from the attack at issue were "reasonably foreseeable" or "natural consequence[s]" of Defendants' conduct. *Owens IV*, 864 F.3d at 794. On this issue, too, the record is clear. Iran not only supported these groups, it actively encouraged them to carry out attacks on civilians in Israel as part of a broader geopolitical strategy and provided both groups with the weapons and know-how to do so effectively. *See supra* Part II.A.

5.    *Federal Cause of Action*

Having concluded that the Court possesses subject-matter jurisdiction, little else is required to show that those plaintiffs who are U.S. nationals are entitled to relief under the federal cause of action that Congress enacted in 2008 as part of the National Defense Authorization Act. *See* Pub. L. No. 110-181, § 1083, 122 Stat. 338–44 (2008) (codified at 28 U.S.C. § 1605A(c)). Although the federal cause of action was added to the FSIA in 2008, "§ 1605A(c) operates retroactively" and "plainly applies . . . to the pre-enactment conduct of a foreign sovereign." *Owens IV*, 864 F.3d at 815. There is almost total "overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign

immunity," *Foley*, 249 F. Supp. 3d at 205, and a plaintiff who offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception: A foreign state is only liable to "a national of the United States," "a member of the armed forces," "an employee [or contractor] of the [U.S.] Government . . . acting within the scope of the employee's employment," or "the legal representative of " any such person, 28 U.S.C. § 1605A(c).

This one exception affects the claims of the non-U.S. national (Israeli national) Plaintiffs in this case.  For jurisdictional purposes, this fact is non-consequential, because the waiver of foreign sovereign immunity applies so long as "the claimant *or* the victim was, at the time of the" terrorist attack, a U.S. national, member of the armed forces, or government employee.  28 U.S.C. § 1605A(a)(2)(A)(ii) (emphasis added).  The federal cause of action, however, is more restrictive and limits plaintiffs to those who are themselves U.S. nationals, members of the armed services, or government employees.  28 U.S.C. § 1605A(c).  Accordingly, the Court concludes that, subject to a showing that they suffer compensable losses, the U.S.-national Plaintiffs have, for the reasons described above, carried their burden of demonstrating that they are entitled to relief under § 1605A(c).  The Court will separately analyze whether the Israeli Plaintiffs have stated a cause of action.

## B.    Personal jurisdiction

The Court also concludes that it has personal jurisdiction over the Islamic Republic of Iran, MOIS, and IRGC.  Under the FSIA, the Court has personal jurisdiction over a foreign state "as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under section 1608."  28 U.S.C. § 1330(b).  Thus, "[i]n order to sue a foreign state or one of its political subdivisions, a plaintiff must effect service in compliance with" 28 U.S.C.

§ 1608(a).  *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).  Here,

all three Defendants are subject to service under § 1608(a) as "a foreign state or [a] political

subdivision" thereof. 28 U.S.C. § 1608(a); *see also* Dkt. 26 at 5.

Section 1608(a) "provides four methods of service in descending order of preference,"

*Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008):

> (1)  by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2)  if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3)  if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
>
> (4)  if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).  Said differently, a party "must attempt service by the first method (or

determine that it is unavailable) before proceeding to the second method, and so on."  *Ben-*

*Rafael*, 540 F. Supp. 2d at 52; *see also Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 773

(D.C. Cir. 2012).

The first two mechanisms of effecting service—by delivery of the summons and complaint either "in accordance with any special arrangement for service between the plaintiff and the foreign state" under § 1608(a)(1) or "in accordance with an applicable international convention on service of judicial documents" under § 1608(a)(2)—were unavailable to Plaintiffs in this case. *See* Dkt. 49 at 23–24. No "special arrangement" governs service between the United States and Iran, nor is the country party to an international convention on service of judicial documents. *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 77–78 (D.D.C. 2017).

As a result, Plaintiffs attempted service under the third alternative, which requires service by mail from "the clerk of the court to the head of the ministry of foreign affairs of the foreign state." 28 U.S.C. § 1608(a)(3). On November 1, 2019, Plaintiffs initiated service as to the Defendants under § 1608(a)(3), *see generally* Dkts. 7–9, and, at Plaintiffs' request, the Clerk of the Court mailed the relevant documents to Iran on November 4, 2019, *see generally* Dkt. 10; however, these mailings suffered from several technical deficiencies. *See Przewozman v. Islamic Republic of Iran*, 628 F. Supp. 3d 307, 315–316 (D.D.C. 2022). In particular, Plaintiffs failed to direct the clerk to "address[] and dispatch[]" the mailing "to the head of the [Iranian] ministry of foreign affairs" as required by § 1608(a)(3). *Id.* Therefore, although Plaintiffs properly served Defendants pursuant to § 1608(a)(4) after their initial § 1608(a)(3) attempt failed, the Court denied Plaintiffs' first motion for default judgment, Dkt. 23, due to their noncompliance with § 1608(a)(3), *Przewozman*, 628 F. Supp. 3d at 317, 320. On December 30, 2022, Plaintiffs again initiated service to Defendants under § 1608(a)(3)—this time abiding by the requirements of the statute. *See generally* Dkts. 31–33. Unlike previously, Plaintiffs directed the Clerk of the Court to "address[] and dispatch[]" the mailing to the "Islamic Republic of Iran,

The Head of the Ministry of Foreign Affairs, Imam Khomeini Street, Imam Khomeini Square, Tehran, Iran 1136914811." Dkt. 34 at 1. Consistent with this request, the Clerk of the Court again mailed the relevant documents to Iran on January 6, 2023, *see generally* Dkt. 35, and the attempt at service was unsuccessful, Dkt. 49 at 24.

Plaintiffs then proceeded to serve Iran pursuant to § 1608(a)(4). That provision requires service by mail from the clerk of court to the secretary of state, who must then transmit the required material "through diplomatic channels to the foreign state." 28 U.S.C. § 1608(a)(4). The Department of State must then send "the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.* Plaintiffs provided the Clerk with the relevant documents and requested service pursuant to § 1608(a)(4) on June 20, 2023. Dkt. 40. The Clerk mailed these materials to the State Department on June 28, 2023. Dkt. 41. On September 25, 2023, the State Department notified the Clerk that the documents had been delivered to the Islamic Republic of Iran. Dkt. 42 at 1. As the Department explained, "[b]ecause the United States does not maintain diplomatic relations with the government of Iran," the documents were transmitted to the Embassy of Switzerland in Iran, which then transmitted the materials to the Iranian Ministry of Foreign Affairs on August 28, 2023. *Id.* The Swiss Embassy reported that the Iranian Ministry of Foreign Affairs "refused" to accept the documents that same day. *Id.* at 10. After Iran failed to respond, the Clerk entered a default. Dkt. 47.

Because Plaintiffs accomplished service pursuant to 28 U.S.C. § 1608(a)(4) on Iran, MOIS, and IRGC, the Court possesses personal jurisdiction over Defendants. *See* 28 U.S.C. § 1330(b).

**C.      Liability for State Law Claims**

In addition to suing under federal law, Plaintiffs assert several state law claims.  As to most of the Plaintiffs, these claims are redundant of their federal law claims and do not provide any additional right to recover.  As noted above, however, the Israeli Plaintiffs are not entitled to recover under federal law.  The fact that they are neither a U.S. national nor a member of the U.S. armed forces does not, however, foreclose them from seeking to recover under state tort law.  *See Owens IV*, 864 F.3d at 809.

Historically, the state-sponsored terrorism exception to the FSIA was not understood to create a federal cause of action against foreign states (as opposed to state officials) but, rather, to operate merely as a "pass-through" for state law claims.  *Id.* at 764; *see also Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004).  When Congress amended the law to provide a federal cause of action, *see* National Defense Authorization Act for Fiscal Year 2008 § 1083, it did not upset the prior law permitting plaintiffs to assert state law claims after clearing the hurdle of foreign sovereign immunity, *see Owens IV*, 864 F.3d at 807–09.  Although most plaintiffs proceeding under the state-sponsored terrorism exception to the FSIA need not rely on state tort law, the "pass-through approach remains" a "viable" option for those who are unable to invoke the federal cause of action, such as "foreign family members" like the Israeli Plaintiffs here.  *Id.* at 809; *see also Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 89 (D.D.C. 2018).

1.      *Choice of Law*

In the absence of a federal cause of action, the Court must first consider what law applies. Because "[t]he FSIA does not contain an express choice-of-law provision" but, rather, specifies that "a foreign state stripped of its immunity 'shall be liable in the same manner and to the same

extent as a private individual under like circumstances,'" the Court must apply the choice of law

rules of the forum state. *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009)

("*Oveissi I*") (quoting 28 U.S.C. § 1606). The Court will, accordingly, apply District of

Columbia choice of law principles.

The District of Columbia uses a choice-of-law rule that "blend[s] a 'governmental

interest analysis' with a 'most significant relationship' test." *Id.* at 842 (quoting *Hercules & Co.,

Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40–41 & n.18 (D.C. 1989)). Under the governmental

interest analysis, the Court "must evaluate the governmental policies underlying the applicable

laws and determine which jurisdiction's policy would be most advanced by having its law

applied to the facts of the case under review." *Id.* (quoting *Hercules & Co.*, 566 A.2d at 41).

And, under the most significant relationship test, the Court must consider the following four

factors taken from the Restatement (Second) of Conflict of Laws: (1) "the place where the injury

occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil[e],

residence, nationality, place of incorporation and place of business of the parties"; and (4) "the

place where the relationship, if any, between the parties is centered." *Id.* (quoting Restatement

(Second) of Conflict of Laws § 145(2) (1971)). Section 145 of the Restatement "also references

the factors in Section 6 of the Restatement, which include the needs of the interstate and the

international systems, the relevant policies of the forum, the relevant policies of other interested

states, certainty, predictability and uniformity of result, and ease in the determination and

application of the law to be applied." *Dammarell v. Islamic Republic of Iran*, No. 01-cv-2224,

2005 WL 756090, at *18 (D.D.C. Mar. 29, 2005) (citing Restatement (Second) of Conflict of

Laws § 145 (1971)); *see also Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 154 (D.D.C.

2011) ("*Owens II*"), *aff'd in part and vacated in part on other grounds*, 864 F.3d. 751 (D.C. Cir.

2017).

Here, there are two potential sources of law that might govern the Israeli-national

Plaintiffs' claims: the law of the forum state (the District of Columbia) and the law of the

plaintiffs' domicile and the place of the attacks at issue (Israel).  Plaintiffs contend that Israeli

law should govern the Israeli Plaintiffs' claims, and the Court agrees.

This case does not raise a conflict between various domestic jurisdictions; rather, the

Court must decide whether to apply D.C. law or the law of a foreign jurisdiction, Israel.  In

*Dammarell v. Islamic Republic of Iran*, the district court applied the law of the U.S.-plaintiffs'

state of domicile—rather than that of Lebanon—to a suit brought by American victims of the

1983 bombing of the United States Embassy in Beirut.  2005 WL 756090 at *20–21.  As the

district court explained, "the injuries in [that] case [were] the result of a state-sponsored terrorist

attack on a United States embassy and diplomatic personnel[,] [and the] United States has a

unique interest in its domestic law . . . determining damages in a suit involving such an attack."

*Id*. at *20; *see also Oveissi I*, 573 F.3d at 843 ("We have no doubt that the United States has a

strong interest in applying its domestic law to terrorist attacks on its nationals, especially when,

as was the case in *Dammarell*, the attacks are 'by reason of their nationality.'").  That principle,

moreover, is supported by the Restatement (Third) of Foreign Relations Law, which recognizes a

country's "jurisdiction to prescribe law with respect to 'certain conduct outside its territory by

persons not its national *that is directed against* the security of the state or against a limited class

of other interests,'" and notes that "this principle is 'increasingly accepted as applied to

terrorist . . . attacks *on a state's nationals by reason of their nationality . . . .*"  *Id.* (quoting

Restatement (Third) of Foreign Relations Law §§ 402(3), 402 cmt. g) (emphasis in *Oveissi I*)

(citation to *Dammarell* omitted).

Although agreeing with this summary of the governing law, the D.C. Circuit declined to

apply domestic U.S. law in *Oveissi I*.  There, in contrast to *Dammarell*, the victim of the

assassination was not a U.S. national, there was no evidence that the assailants knew that the

victim's grandchild—the plaintiff in *Oveissi I*—was a U.S. national, and there was no evidence

that "the United States or its nationals were in any other way the object of the attack."  *Id.* at 843.

The evidence, to the contrary, showed that the assassination occurred in France, and was

intended "to deter French intervention in Lebanon."  *Id.* (emphasis omitted).  In short, "if any

country was the object of the attack, it was France."  *Id.*  The D.C. Circuit, therefore, concluded

that French law should govern.  *Id.*

Although not identical, the present case is closer to *Oveissi I* than it is to *Dammarell*.

The terrorist attack occurred in Israel and was part of a sustained campaign of bombardment,

during which Hamas and PIJ fired more than 600 rockets into Israel.  *See* Dkt. 49-1 at 41 (Levitt

Decl.).  As in *Oveissi I*, there is no evidence that "the United States or its nationals were in

any . . . way *the object*" of the attack, although the direct victim was a U.S. national.  *Id.*

(emphasis added).  This case is, moreover, on all fours with *Fraenkel v. Islamic Republic of Iran*,

248 F. Supp. 3d 21 (D.D.C. 2017), *rev'd in part on other grounds*, 892 F.3d 348 (D.C. Cir.

2018), where the district court applied the principles discussed above and held that Israeli law,

rather than D.C. law, was appropriate.  *Id.* at 39.  There, the court concluded that "Israel ha[d]

the greatest interest in having its laws apply and the most significant relationship to the events"

because "the injury occurred in Israel; the conduct causing the injury occurred in Israel, the

Palestinian territories, [and] Iran . . . ; [the plaintiff] is and always has been an Israeli citizen; and

there is no legal relationship between [the plaintiff] and any of the defendants or Hamas." *Id.*; *see also Force*, 464 F. Supp. 3d at 373–74 (applying Israeli law to the claims of Israeli citizens whose injuries stemmed from terrorist attacks in Israel even though the direct victims of the attacks were all U.S. citizens). The same considerations are present here with respect to the non-U.S.-national/Israeli Plaintiffs. Not only did all the relevant events occur in Israel and these particular plaintiffs are Israeli citizens, the direct victim on which their claims are predicated was a U.S. citizen who permanently resided in Israel and held dual U.S.-Israeli citizenship. *See* Dkt. 49-8; Dkt. 49-15. The Court, accordingly, concludes that Israeli law should govern.

      2.    *Liability*

Having concluded that Israeli law applies, the Court will turn to whether the Israeli Plaintiffs have adequately alleged a claim under that country's law. When applying foreign law, "the [C]ourt may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 44 (D.D.C. 2016) (quoting Fed. R. Civ. P. 44.1). Although "the [C]ourt is not limited by material presented by the parties," and "may engage in its own research," it is also "free to insist on a complete presentation by counsel." Fed. R. Civ. P. 44.1 advisory committee's note to 1966 amendment. A "court's determination" regarding foreign law "must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1.

In their amended complaint, Plaintiffs allege that Defendants committed the following torts: (1) wrongful death of Pinches Przewozman; (2) IIED; (3) loss of consortium, and (4) aiding and abetting. *See* Dkt. 6 at 10–13 (Am. Compl. ¶¶ 37–51). Under Israeli law, the tort of "negligence" includes "what American common-law would consider an intentional tort." *Henkin v. Islamic Republic of Iran*, No. 18-cv-1273, 2021 WL 2914036, at *8, *12 (D.D.C. July

12, 2021); *see also Force*, 464 F. Supp. 3d at 374.  Therefore, to prevail on their IIED claim against Defendants, Plaintiffs must show that they have satisfied the elements of negligence under Israeli law.[3]  "The Israeli civil tort of negligence is codified in the Civil Wrongs Ordinance (CWO)," and "requires a finding of the same elements as U.S. law: duty, breach, causation, and injury."  *Fraenkel*, 248 F. Supp. 3d at 39.  Applying that standard to the Israeli Plaintiffs' claims, the Court concludes that the Israeli plaintiffs have adequately alleged a claim of negligence against Defendants.

First, "duty of care under Israeli law is sometimes divided between the conceptual duty of care and concrete duty of care."  *Force*, 464 F. Supp. 3d at 374 (internal quotations omitted).  "According to Israeli tort law[,] a duty of care (both conceptual and concrete) is presumed to exist whenever a reasonable person could have foreseen that the conduct at issue could cause harm of the type alleged."  *Id.; see also id.*  ("[E]very person owes a duty to all persons whom . . . a reasonable person ought in the circumstances to have contemplated as likely in the usual course of things to be affected by an act, or failure to do an act." (quoting CWO, § 36, 2 LSI (New Version) 15 (1972))).  The Court finds that Plaintiffs have demonstrated that Defendants were under a duty of care to Hadassah Przewozman, Chaya Rochel Przewozman, and Y.P. Przewozman because, as noted above, "their injuries were foreseeable consequences" of Iran's provision of material support to Hamas and PIJ.  *Fraenkel*, 248 F. Supp. 3d at 39; *Force*, 464 F. Supp. 3d at 375.

---

[3] The Court notes that although Plaintiffs did not plead negligence under Israeli law in their amended complaint, Plaintiffs argue that they have satisfied the elements necessary to prevail on that claim in their motion for default judgment.  In other cases this Court has forgiven a failure to plead negligence under Israeli law when the plaintiff pleads an intentional tort.  *See, e.g.*, *Henkin*, 2021 WL 2914036, at *11–12; *Borochov v. Islamic Republic of Iran*, 589 F. Supp. 3d 15, 39 (D.D.C. 2022), *vacated and remanded on other grounds*, 94 F.4th 1053 (D.C. Cir. 2024).  The Court will do the same here.

Second, "[a] breach of the duty of care occurs when a party with a duty fails to take reasonable precautionary measures." *Fraenkel*, 248 F. Supp. 3d at 39 (internal quotations omitted); *Borochov*, 589 F. Supp. 3d at 40. Far from taking precautionary measures, Iran provided Hamas and PIJ with financing, weapons and training, and actively encouraged terrorist operatives to carry out attacks against the civilian population of Israel. *See Force*, 464 F. Supp. 3d at 375. The Court, accordingly, concludes that Defendants breached their duty of care to the Israeli plaintiffs.

Third, "Israeli courts divide a causation analysis into cause in fact and legal, or proximate, causation." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 62–63 (D.D.C. 2010). "Factual causation depends on a but-for test," *id.*, whereas "legal causation is met '[i]f a reasonable person could have foreseen that a harm of the kind that happened might happen.'" *Force*, 464 F. Supp. 3d at 375 (internal quotations omitted). Both types of causation are satisfied here. As noted above, Plaintiffs have demonstrated that, but-for the material support of Iran, Hamas and PIJ would not have had the economic resources or the training necessary to carry out the attacks at issue. And, it was certainly foreseeable that, by providing Hamas and PIJ material support and encouraging them to carry out terrorist attacks against civilians in Israel, Iran would cause serious injury or death to civilians in Israel and would inflict mental and emotional anguish on their families. Indeed, that is one of the purposes of terrorism.

Finally, "the CWO defines harm as 'loss of life, or loss of, or detriment to, any property, comfort, bodily welfare, reputation, or other similar loss or detriment.'" *Borochov*, 589 F. Supp. 3d at 40. "That definition of harm includes emotional and psychological damages." *Id.*; *see also Force*, 464 F. Supp. 3d at 375. The Israeli Plaintiffs have submitted declarations and deposition testimony that address the mental and emotional anguish they experienced as a result of their

family member's death.  *See* Dkt. 49-18 (Chaya Rochel Przewozman Decl.); Dkt. 49-19 (Hadassah Przewozman Decl.); Dkt. 50-1 (Chaya Rochel Przewozman Dep.); Dkt. 50-2 (Hadassah Przewozman Dep.).  The Court, accordingly, finds that they have adequately demonstrated harm.

For these reasons, the Court finds that the Israeli Plaintiffs have met their burden of showing that they have a right to relief.  The Court will thus grant the motion for default judgment as to the Israeli Plaintiffs.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' motion for default judgment, Dkt. 49, is **GRANTED** with respect to their claims against Iran, MOIS, and IRGC. The Court will **APPOINT** a special master to hear their damages claims and to report to the Court recommending the appropriate award as to those plaintiffs.  A separate order appointing a special master and setting the terms of that appointment will follow.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  August 14, 2024