**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAYA RACHEL PRZEWOZMAN, *et. al.* ) | |
| ) | |
| *Plaintiffs,* ) | |
| vs. ) | Civil Action No. 19-2601 |
| ) | (RDM) |
| ISLAMIC REPUBLIC OF IRAN, *et al.,* ) | |
| ) | |
| *Defendants.* ) | |

### REPORT AND RECOMMENDATION OF THE SPECIAL MASTER REGARDING COMPENSATORY DAMAGES FOR THE PRZEWOZMAN PLAINTIFFS

This case arises out of a terrorist attack that took place in Israel on May 5, 2019 during which Pinches Przewozman was killed. Plaintiffs include the estate of the Direct Victim and his family members. The Defendants are the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), and the Iranian Revolutionary Guard Corps ("IRGC") (together, the "Iranian Defendants"). Plaintiffs allege that their injuries were caused by the Iranian Defendants' provision of material support to two terrorist organizations, Hamas and Palestinian Islamic Jihad ("PIJ"). Plaintiffs seek compensatory and punitive damages under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. None of the Defendants has answered or otherwise appeared in this action. On November 21, 2023, the Clerk of Court entered default as to the Iranian Defendants. Dkt. 47. The Court issued a Memorandum Opinion and Order granting default judgment on August 14, 2024. *Przewozman v. Islamic Republic of Iran*, 754 F. Supp. 3d 1 (D.D.C. 2024) (Dkt. 52) ("Memorandum Order on Default").[1]

---

[1] The Court denied a motion for default judgment as to Plaintiff P.P., without prejudice, explaining

The Court appointed the undersigned to evaluate the claims for compensatory damages of the Plaintiffs and to provide a report and recommendation to the Court. Dkt. 54 at 1-2. Subsequently, counsel for Plaintiffs provided documentation in support of the Plaintiffs' damages claims.

I have reviewed the relevant pleadings, the sworn affidavit and deposition testimony of the Plaintiff family members and estate representatives, documentation of the citizenship of the individual plaintiffs, the Plaintiffs' Motion for Default Judgment, the Court's Memorandum Opinion of August 14, 2024, and applicable case law. My Report and Recommendation is based on the above-described information, evidence, and case law.

## BRIEF BACKGROUND

Section 1605A(c) of the FSIA creates a private right of action for money damages for United States nationals, members of the U.S. armed forces, and United States government employees or contractors (acting within the scope of their employment) who are injured or killed by terrorist acts carried out by officials, employees, or agents of a foreign state that is designated as a state sponsor of terrorism. *See* 28 U.S.C. § 1605A(c). Family members of those injured or killed in such terrorist acts may also seek money damages for their own injuries. Qualified plaintiffs may seek compensatory damages including economic damages, solatium damages, and pain and suffering damages.[2]

The determination of the appropriate amount of compensatory damages depends on the specific facts and circumstances of each claim and the evidence submitted in support of the claim.

---

that the Plaintiffs' initial complaint listed ten plaintiffs but the amended complaint added an additional plaintiff, P.P. However, this plaintiff is "not mentioned in any subsequent filings, including the motion for default judgment, Dkt. 49, except to explain why P.P's motion should receive a higher damages award. The Court… therefore den[ied] the motion for default judgment, without prejudice, as to P.P." 754 F. Supp. 3d 1, 10.

[2] *See* 28 U.S.C. § 1605A(c).

The Court's Appointment Order outlines specific guidelines:

> Although the Court is not strictly bound by the Federal Rules of Evidence in a default proceeding against a state sponsor of terrorism, *see Owens v. Republic of Sudan*, 864 F.3d 751, 785–86 (D.C. Cir. 2017), the Special Master should be guided by those rules.

> The Special Master shall hold damages proceedings "and make or recommend findings of fact on" the scope of each Plaintiff's physical and emotional injuries pursuant to Fed. R. Civ. P. 53(a)(1)(B). The Court authorizes the Special Master to receive and to review evidence in this case.

> The Special Master shall, as to each claim referred to her, submit a report to the Court containing recommended findings of fact and conclusions of law regarding damages. The report shall contain an evaluation of each item of damages governing Plaintiffs' right of recovery.

Dkt. 54 at ¶ 2 ("Appointment Order").

Following the case law in this Circuit, I am entitled to rely on documentary evidence that is properly submitted and authenticated by sworn declarations, deposition testimony, and trial testimony. Plaintiffs may prove their claims "using evidence that might not be admissible in a trial," because the Court is not required "to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), vacated and remanded on other grounds by *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020). Uncontroverted factual allegations that are supported by admissible evidence are deemed to be true. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010); *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 28-29 (D.D.C. 2020) ("*Barry II*") (collecting cases). In evaluating solatium damages, I may rely on written declarations from family member claimants describing the attack's effect on him or her. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015) (relying on wife's declaration and finding her emotional distress "reasonably certain to occur" as a result of an attack on her husband).

The first portion of this Report and Recommendation sets forth factual findings for each of

3

the Plaintiffs.  The second portion of the Report and Recommendation outlines the applicable case law and my recommendation for compensatory damages for the Direct Victim.  The third portion of this Report and Recommendation outlines the case law and recommendations for compensatory damages for the Family Member Plaintiffs.  The final section of the Report and Recommendation addresses the Plaintiffs' request for prejudgment interest.

## BACKGROUND

The Direct Victim Plaintiff is the Estate of the deceased Direct Victim – Pinches Menachem Przewozman.  The Family Member Plaintiffs are Chaim Dov Przewozman, Hadassah Przewozman, Y.P., Chaya Rachel Przewozman, A.M.P., F.P., Sara Przewozman Rozenbaum, Yafa Przewozman, Tzvi Yosef Przewozman, and P.P.[3]  The Estate of the Direct Victim seeks pain and suffering damages.[4]  Each of the Family Member Plaintiffs seeks solatium damages.  Seven of the Plaintiffs are United States citizens and have submitted documentation establishing that they are United States Nationals within the meaning of Section 1605A and therefore have standing to bring the claims.  Three of the Plaintiffs are non-U.S. nationals.  The Court's Memorandum Order on Default finds that the three non-U.S. Nationals are entitled to bring claims for compensatory damages in this matter under Israeli law.  Dkt. 52 at 16-17, 31-35.  Their claims will be assessed applying the underlying requirement of proof of severity of harm under Israeli law but, under the specific circumstances of this case, will apply the general framework under U.S. federal law to determine the amount of damages for each such eligible plaintiff.

---

[3] This Report and Recommendation will not analyze Plaintiff P.P.'s claims due to the Court's denial of the motion for default judgment pertaining to Plaintiff P.P.  Memorandum Order on Default, Dkt. 52 at fn 1.

[4] Although the Amended Complaint references economic loss damages, the Plaintiffs have not submitted any documentation in support of economic loss and counsel has confirmed that the Estate of Pinches Przewozman does not seek economic loss damages.

## FACTUAL FINDINGS

### I.      DIRECT VICTIM

Pinches Menachem Przewozman is the Direct Victim.  Pinches was a dual Israeli and U.S. citizen.  The Court has determined the Direct Victim was killed as a result of a Hamas and PIJ terror attack.  Dkt. 52 at 14-15.  Pinches Menachem Przewozman was killed on May 5, 2019 in Israel.  *Id*. at 13.  The Court found that he was killed when terrorist groups fired mortars and rockets from the Gaza Strip into Israel.  *Id.*  Plaintiff Pinches Menachem Przewozman was struck with shrapnel from a rocket or mortar explosion. *Id.* at 13.  He was transported to Assuta Medical Center and pronounced dead shortly after his arrival at the hospital. *Id.*

Pinches Przewozman was 21 years old at the time of his death.  Pinches Menachem Przewozman Death Certificate, Dkt. 49-8. He was married and had one young child who was under 2 years of age at the time of his death.  His second child was born 4 months after his death.  The file does not contain any medical records or an autopsy report or testimony from the hospital or medics.

### II.     INDIRECT VICTIMS

### A. CHAIM DOV PRZEWOZMAN (FATHER OF PINCHES MENACHEM PRZEWOZMAN)

Chaim Dov Przewozman is the father of Pinches Menachem Przewozman.  He submitted affidavit and deposition testimony in support of his claim.  Affidavit of Chaim Dov Przewozman ("Chaim Affidavit"), dated August 8, 2021, Dkt. 49-17; Deposition of Chaim Dov Przewozman ("Chaim Deposition"), dated August 30, 2021, Dkt. 48-1 (filed under seal).  Chaim is a citizen of the United States.

Chaim testified that Pinches was his oldest son and he felt tremendous joy when he was born.  Chaim Deposition at 21:14-21.  He stated that the family loved Pinches very much and had

a wonderful relationship with him. *Id*. at 22:4-5.

On the day of the attack, Chaim received a call from a friend informing him that Pinches was injured in a missile attack and that he should go to the Assuta Hospital. Chaim Affidavit at ¶ 6. On the ride to the hospital with his wife and his brother-in-law, Chaim stated that he could only think about his son and seeing him again. *Id*. Two of Chaim's brothers knew that Pinches had been killed but did not tell him. *Id*. When he arrived at the hospital, a medic informed them that Pinches was killed instantly. *Id*. ██████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████. He immediately made arrangements for the funeral and burial, which occurred that same night. *Id*. at 12:14-14:20.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████  He testified that he is less functional and much less happy than he was prior to Pinches' death. *Id*. at 39:24-25. He was not a smoker before Pinches' death but started smoking afterwards to calm himself down. *Id*. at 20:17-19. ████████████████████████████

██████████████████████████████████████████. Chaim believes that Pinches' death has affected his ability to be the devoted father he used to be. *Id*. at 37:7-11.

Chaim described Pinches as "the life of the home, encouraging family gatherings and planning family trips." Chaim Affidavit at ¶ 3. Chaim testified that the family has never been the same since "the life of [their] family was taken from [them]" the day of Pinches' death. *Id*. at ¶ 7.

## B. HADASSAH PRZEWOZMAN (WIFE OF PINCHES MENACHEM PRZEWOZMAN)

Hadassah Przewozman is the wife of Pinches Menachem Przewozman. She submitted affidavit and deposition testimony in support of her claim. Affidavit of Hadassah Przewozman ("Hadassah Affidavit"), dated August 8, 2021, Dkt. 49-19; Deposition of Hadassah Przewozman ("Hadassah Deposition"), dated August 30, 2021, Dkt. 48-3 (filed under seal). Hadassah is an Israeli citizen.

On the day of the attack, Hadassah heard the sirens and ran with her son to a protected room with the rest of her family and heard explosions, screaming, and shouting. Hadassah Deposition at 8:22-9:9. She testified that she called Pinches several times because she knew he was near the location of the explosions but he did not answer and she began to get hysterical. *Id*. at 9:14-10:5. ███████ ████████████████████████████████ ████████████████████████████████████████ ███████ She testified that paramedics told her that Pinches was hurt but conscious but her father went to the hospital, came back, and informed her that Pinches had died. *Id*. at 12:22-13:21. ████████████████████ ████████████████████████████████████ ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████

Hadassah testified that she was pregnant with her second child at the time of Pinches' death and she was concerned how she was going to manage without Pinches. Hadassah Deposition at 17:24-18:14. She described that it is extremely difficult raising her two sons alone and that she has had to take over parental responsibilities that Pinches used to manage.

*Id*. at 22:6-18.

████████████████████████████████████████████████████ :1.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████

### C. Y.P. (SON OF PINCHES MENACHEM PRZEWOZMAN)

Y.P. is the minor son of Pinches Menachem Przewozman.  Y.P. did not provide declaration testimony but his mother, Hadassah Przewozman, provided testimony describing the effect of his father's death on Y.P.  Y.P. is a citizen of Israel.

Hadassah testified that Y.P. was one year and seven months old when his father was killed.  *Id*. at 14:21-24.  She further testified that he kept calling for his father and looking for him after his death.  *Id*. at 17:4-22.  Hadassah stated that Y.P. is constantly missing a father figure in his life.  *Id*. at 23:12-24:19.

### D. CHAYA RACHEL PRZEWOZMAN (MOTHER OF PINCHES MENACHEM PRZEWOZMAN)

Chaya Rachel Przewozman is the mother of Pinches Menachem Przewozman.  She provided affidavit and deposition testimony in support of her claim.  Affidavit of Chaya Rachel Przewozman ("Chaya Affidavit"), dated August 8, 2021, Dkt. 49-18; Deposition of Chaya Rachel Przewozman ("Chaya Deposition"), dated August 30, 2021, Dkt. 48-2 (filed under seal).  Chaya is an Israeli citizen.  Chaya described her relationship with Pinches as very good and very close.  Chaya Deposition at 14:5-16.

She found out Pinches was injured in a missile attack and was praying for him on the ride to the hospital.  Chaya Affidavit at ¶ 5.  Her husband, Chaim Dov Przewozman, learned that Pinches' injuries were severe and told her to expect the worst and she "was stricken with

such sorrow [she] immediately began to scream and cry hysterically.  *Id.* at ¶ ███████████

████████████████████████████████████████████████████████████████████

████████████████████    ██████████████████████████████████████████

█████████████████████ .

Chaya testified that her life has never been the same since her first-born son was taken

from her.  Chaya Affidavit at ¶ 6.  ██████████████████████████████████████████

██████████████████████████████████████    ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████ .  ███████████    ██████████████████████████

████████████████████████████████████████████████    ████████ .

Whenever she hears an air raid siren she becomes hysterical and is terrified.  *Id.* at 18:16-20.

████████████████████████████████████████████████████████████████████

███████████████████████████ .

## E.  A.M.P. (BROTHER OF PINCHES MENACHEM PRZEWOZMAN)

A.M.P. is the minor brother of Pinches Menachem Przewozman.  A.M.P. did not

provide declaration testimony but his family members provided testimony describing the effect

of Pinches' death on A.M.P.  A.M.P. is a United States citizen.

A.M.P. was a young teenager when Pinches died.  Chaim Deposition at 35:23-25.  Tzvi

Przewozman, A.M.P.'s older brother, testified that he was with A.M.P when they found out

that Pinches had been killed and that A.M.P. burst out crying.  Deposition of Tzvi Yosef

Przewozman ("Tzvi Deposition"), dated September 1, 2021, at 16:21-24, Dkt. 48-6 (filed

under seal).  ████████████████████████████████████████████████████████



## F.  F.P. (SISTER OF PINCHES MENACHEM PRZEWOZMAN)

F.P. is the minor sister of Pinches Menachem Przewozman.  F.P. did not provide declaration testimony but her family members provided testimony describing the effect of her brother's death on F.P.  F.P. is a citizen of the United States.

Sara, F.P.'s older sister, was the one who told F.P. that Pinches had been killed and stated that F.P. burst out crying. Rozenbaum Deposition at 13:13-20. After her brother's death, F.P. is filled with anxiety and has a lot of fears. Chaya Deposition at 21:18-22:20

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████        ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████    ██████████████████████████████████████

████████████████████████████████████████████████ .

    ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

### G. SARA PRZEWOZMAN-ROZENBAUM (SISTER OF PINCHES MENACHEM PRZEWOZMAN)

Sara Przewozman-Rozenbaum is the older sister of Pinches Menachem Przewozman. She submitted affidavit and deposition testimony in support of her claim. Affidavit of Sara Przewozman-Rozenbaum ("Rozenbaum Affidavit"), dated August 8, 2021, Dkt. 49-20; Rozenbaum Deposition. Sara is a citizen of the United States. Sara testified that she and

11

Pinches were very close and she felt the most comfortable with him.  Rozenbaum Deposition at 19:1-10.

Sara described being very frightened while sitting Shiva for Pinches because they were in the neighborhood where Pinches had been killed and they did not know if there would be a ceasefire.  *Id*. at 14:16-21.  After Pinches' death, Sara testified that her fears have been heightened and she gets extremely anxious and hysterical if her husband or children are slightly late coming home.  *Id*. at 17:6-18.  ███████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████.  Sara testified that her brother's death still affects her today.  *Id*. at 30:1-31:2.  She said that his death has made her life very difficult and it especially affects her at work because she loses her concentration and has memory lapses.  *Id*. Sara declared that her family has not been the same since the attack.  Rozenbaum Affidavit at ¶ 5.

### H. YAFA PRZEWOZMAN (SISTER OF PINCHES MENACHEM PRZEWOZMAN)

Yafa Przewozman is the sister of Pinches Menachem Przewozman.  She submitted affidavit and deposition testimony in support of her claim.  Affidavit of Yafa Przewozman Schecter ("Yafa Affidavit"), dated August 8, 2021, Dkt. 49-21; Yafa Deposition.  Yafa is a citizen of the United States.

Yafa stated that Pinches was right above her in age order so they would play together, talk, and discuss their lives.  Yafa Deposition at 16:14-25.  ███████████████████████ ████████████████████████████████████████████████████████████.  Yafa testified that she was very close to her brother and cannot put into words the loss that she has felt since he was killed.  Yafa Affidavit at ¶ 5.  Yafa testified that she could not complete her studies after

Pinches' death because she could not concentrate, listen, or do the projects. Yafa Deposition at 14:7-15:7. She has insomnia due to Pinches' death, has difficulty making friends, and has lost interest in things that used to enjoy. *Id*. at 16:3-4; 19:16-25; 24:15-23.

## I. TZVI YOSEF PRZEWOZMAN (BROTHER OF PINCHES MENACHEM PRZEWOZMAN)

Tzvi Yosef Przewozman is the younger brother of Pinches Menachem Przewozman. He provided affidavit and deposition testimony in support of his claim. Affidavit of Tzvi Yosef Przewozman, dated August 8., 2021, Dkt. 49-22; Tzvi Deposition. Tzvi is a citizen of the United States.

Tzvi and Pinches were very close throughout their childhood and they had a warm relationship. Tzvi Deposition at 10:2-21. █████████████████████████ █████████████████████████████ He testified that he heard conflicting reports in a short period of time about Pinches' injuries. He was told initially that Pinches was injured and then was told that he had passed and then was told that they were incorrect and attempts were being made to revive or resuscitate Pinches. *Id*. at 14:10-16. Tziv found out once he arrived home that Pinches was no longer alive. ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████ He feels that his family is no longer complete. He misses Pinches and thinks about him every day. Tzvi Affidavit at ¶ 5.

**ANALYSIS OF COMPENSATORY DAMAGES**

**I.        COMPENSATORY DAMAGES – ESTATE OF DIRECT VICTIM**

The "estate of a plaintiff who would have had standing to sue 'is expressly covered by, and entitled to bring claims under, Section 1605A(c).'" *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 138 (D.D.C. 2019) (quoting *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78-79 (D.D.C. 2017)).   In order for an estate-plaintiff to bring an action under the FSIA, "the plaintiff must first establish the estate's standing, or '[its] power . . . to bring and maintain legal claims.'" *Barry II*, 437 F. Supp. 3d at 36 (quoting *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017) ("*Cohen I*")).   "The determination of whether an estate may maintain a cause of action for injuries suffered during the decedent's life is a question 'governed by the law of the state which also governs the creation of the estate.'"  *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011)).

In this case, Plaintiffs have stated that the estate was established under Israeli law.[5]  The Amended Complaint states that the Estate is represented by Chaim Przewozman, the Victim's father.  Amended Complaint, Dkt. 6 at ¶ 5.  In their Renewed Motion for Default Judgment, Dkt. 49 at fn 7, Plaintiffs state that Mr. Przewozman's wife has standing under Israeli law to bring a survival action, citing Civil Wrongs Ordinance (New Version) § 19, 5728–1968, 2 LSI (New Version) 5 (1972) as amended (Isr.)).  Under Israeli law the Victim's parents, spouse, and children have standing to assert a claim on behalf of the Estate of the Direct Victim.  *Id*. (citing *Ests. Of Ungar ex. Rel. Strachman v. Palestinian Auth.*, 304 F.Supp.2d 232, 261 (D.R.I. 2004) ("Israeli law

---

[5] I have requested the Estate documents from Plaintiffs' counsel.  The Plaintiffs' Renewed Motion for Default Judgment at footnote 7 states that the Estate was established under Israeli law.  Dkt. 49 at fn 7.

provides that when a decedent dies intestate the 'legal heirs entitled to succession [are]: (1) Spouse of deceased; (2) children and their descendants and parents of deceased and their descendants.' Martindale–Hubbell International Law Digest, Israel Law Digest, Estates and Trusts, Descent and Distribution at 8."); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 398 (D.D.C. 2015) (finding that because the estate of the victim was established under Israeli law, the victim's heirs had standing to bring a survival action on behalf of the estate). Although it is unclear whether Mr. Przewozman's father or spouse is the appointed representative of the Estate, both have standing under applicable law and accordingly the Court may address the claim for damages for the Estate.

As noted, the Estate of Pinches Przewozman did not submit an economic loss report and accordingly there is no basis upon which to determine any economic loss. I therefore assess the Estate claim only for pain and suffering damages. Because the Direct Victim was a U.S. National, the damages analysis is based on U.S. law and, as directed by the Court, I assess and apply the body of law developed in this jurisdiction governing the basis for and range of compensatory damages for extrajudicial killing under the FSIA. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 84; s*ee also* Appointment Order at ¶ 2.

The Estate of a victim who is killed in the terrorist attack, may recover compensatory damages if there is evidence that the victim experienced conscious pain and suffering before death, even if for a very short period of time. The amount of damages is based on multiple factors including the duration of the pain and suffering, the nature and extent of the injuries, the fear and terror experienced by the victim, and the circumstances surrounding the death. In general, courts in this district have concluded that an award of $1 million in pain and suffering for a victim who lives and endures pain or fear for a few seconds or minutes after sustaining injuries is appropriate, although there is variation in the awards based on the individual facts of each case. *See Force v.*

15

*Islamic Republic of Iran*, 617 F. Supp. 3d 20, 34 (D.D.C. 2022) (award of $1.5 million to the estate of a victim who was conscious and experienced horrific pain during and for one hour after the attack, award of $1 million to the estate of a victim who was only conscious for up to a minute or two after the attack, and award of $1 million to the estate of a victim where there was no evidence of consciousness after the initial attack but who was in hiding for seven to eight minutes before being killed); *Est. of Fishbeck v. Islamic Republic of Iran*, No. 1:18-CV-2248-CRC, 2024 WL 4119382, at *2 (D.D.C. 2024) ("'[W]hen the victim endured extreme pain and suffering for several hours or less, courts in these cases have rather uniformly awarded $1 million, adjusting upward when the victim's pain is longer and downward when the victim survived for only a few minutes'") (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 53 (D.D.C. 2007) (*Peterson II*), abrogated on other grounds by *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9 (D.C. Cir. 2015)); *Owens v. Republic of Sudan,* 71 F. Supp. 3d 252, 260 (D.D.C. 2014) (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006)) (Court has most frequently awarded $1 million in damages to victims who "endured extreme pain and suffering for a period of *several hours or less*") (emphasis in original); *Selig v. Islamic Republic of Iran,* 573 F.Supp.3d 40, 64 (D.D.C. 2021) (quoting *Wultz v. Islamic Republic of Iran*, 864 F.Supp.2d 24, 37–38 (D.D.C. 2012)) (Courts "typically award[ ] $1 million to a victim who survives a few minutes to a few hours after [the attack].").

The analysis of pain and suffering damages includes consideration of the mental anguish arising from the conscious knowledge of imminent death. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 81–82 (D.D.C. 2011) ("Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent."); *see also Force*, 617 F. Supp. 3d at 34

16

(victim was entitled to $1 million in pain and suffering because he was aware of his possible imminent death and was in hiding for seven to eight minutes before death); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 157 (D.D.C. 2010) (victim was "entitled to additional compensation in the amount of $1,000,000 for the portion of his life that he spent facing certain death alone"); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (award of $500,000 to the estate of the executed victim "for the pain and suffering he endured prior to being singled out for execution" and an additional $1 million for "the several minutes of anguish and pain [the victim] endured as and immediately after being shot by [a terrorist] and thrown from the [air]plane").

If the victim is killed instantly, there is no award for pain and suffering. *See Roth*, 78 F. Supp. 3d at 402 (internal citations omitted) ("Plaintiffs who were killed in the attack giving rise to the cause of action cannot receive an award for pain and suffering if their death was instantaneous . . . Also, a court must refuse to award damages for pain and suffering if the plaintiff is unable to prove that the decedent consciously experienced the time between an attack and his or her death.").[6]

There are no medical records or reports from the hospital or persons who transported Mr. Przewozman to the hospital. The documentation regarding the circumstances of Mr. Przewozman's death are based on media reports and testimony of family members who were not eyewitnesses and necessarily relied on statements from others as well as the State of Israel Ministry

---

[6] In some cases, courts have approved significantly higher awards that generally are based on the relative egregiousness of the circumstances. *See, e.g., Sotloff v. Syrian Arab Republic*, No. 16-CV-725 (TJK), 2022 WL 22902285, at **18-19 (D.D.C. May 20, 2022), report and recommendation adopted, No. CV 16-725 (TJK), 2023 WL 2727599 (D.D.C. Mar. 31, 2023) (awarding $54,000,000 and $56,500,000 for pain and suffering to two victims who experienced prolonged physical and mental abuse for prolonged captivity and extremely brutal executions).

of Defense The Central Bureau of Statistics Legal Adviser of the Security Services' Decision of the Certifying Authority according to Section 10 of the Compensation for Victims of Hostile Actions Law, 5730-1970, Dkt. 49-8.    This document is a decision certifying that Mr. Przewozman's death was caused by hostile action. *Id*. This document states that Mr. Przewozman was killed by shrapnel. *Id*.

The media report of the attack and Mr. Przewozman's death stated: "The slain Ashdod man was injured in the chest by shrapnel, medics said. He was running from his apartment to a bomb shelter when he was struck by the debris from the rocket, reports said. Prezuazman was taken to the Assuta Medical Center for treatment but pronounced dead shortly afterward." *Ashdod man killed by rocket, raising death toll to 4, amid massive bombardment,* Israel Times, dated May 5, 2019, Dkt. 49-7.

The testimony of various family members all address the manner in which they learned of Mr. Przewozman's death.  The statements of family members are consistent with the media report – stating that Mr. Przewozman was running from his apartment to a shelter and that he was struck by shrapnel from the bombs.  Most of the family members state that they were told he was injured and had been taken to the hospital.  *See e.g.*, Hadassah Deposition at 13:2-5 (A paramedic "came to the house and he said [he] saw [Pinches] and [Pinches] was conscious… He's going to be okay."); Tzvi Deposition at 14:7-10 ("the first time when they told me that he passed and then they said that they were mistaken and that they were still working on him").  The deposition testimony of Mr. Przewozman's mother states that she viewed his body at the hospital and his face was untouched.  Chaya Deposition at 10:6-15.  I note, however, that the affidavit of the Victim's father, Chaim Dov Przewozman, states that the medics told the family that his son had been killed instantly.  Chaim Affidavit at ¶ 6. The available evidence, as a whole, indicates that the Victim

18

was not killed by the explosion directly but instead was killed by shrapnel while running for shelter.

There is no documentation that confirms that Mr. Przewozman was conscious after being hit with shrapnel. It does appear clear and uncontroverted, however, that Mr. Przewozman was running for his life at the time he was struck. Based on the evidence in the record, I cannot determine whether Mr. Przewozman was conscious after being injured but I believe that the record supports a finding that Mr. Przewozman would have experienced fear and anguish while running to escape the attack. The testimony of family members documents Mr. Przewozman's concerns about the deadly nature of these attacks: the record shows that he repeatedly called his parents so that they were aware of his well-being during an attack the day before his death – confirming that he was acutely aware of the life-threatening danger. Chaya Affidavit at ¶ 4.

Under the guidance in this Circuit, as noted above, it is appropriate to consider a pain and suffering award for the period of time when Mr. Przewozman experienced fear of imminent death. The case law cited above supports an award of $1 million for the period of time, albeit short, when Mr. Przewozman was running in fear for his life to escape the bombardment. Accordingly, I recommend an award of $1 million in pain and suffering damages for the Estate of Pinches Przewozman.[7]

## II. RECOMMENDED NON-ECONOMIC/SOLATIUM AWARDS FOR FAMILY MEMBERS OF THE DIRECT VICTIM

### A. Law Governing Solatium Damages – U.S. National Plaintiffs

Section 1605A(c) expressly provides for solatium damages to immediate family members

---

[7] In some cases, the courts have awarded $500,000 where there is uncertainty about the duration of mental anguish or pain and suffering and such an award would not be unreasonable in this case. But, my recommendation is consistent with a number of other decisions that have based a pain and suffering award on mental anguish.

of victims of terrorist attacks.  Solatium damages provide compensation for mental anguish, grief, and loss of society and comfort.  *See Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an IIED [intentional infliction of emotional distress] claim... Solatium is awarded to compensate the the [sic] mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort.") (internal citations, quotation marks, and alterations omitted)).  The immediate family is defined as the victim's spouse, parents, siblings, and children. *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) ("Heiser II") (citing *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 n.8 (D.D.C. 2001), aff'd sub nom. *Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003)). In general, there is a presumption that immediate family members suffer grief and emotional injury as a result of a family member's death or injury resulting from a terrorist attack. *See Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) ("The guidelines emerging from prior decisions begin with the 'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'") (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)) (internal alterations omitted); *Roth*, 78 F. Supp. 3d at 403 ("Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish. As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages.") (citations omitted).

The intent of terrorist attacks is to cause fear and anguish among the public in general and family members in particular.  *See Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d. 105, 115

20

(D.D.C. 2005) (a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families). Multiple decisions have confirmed that the immediate family members need not be present at the attack to be eligible for solatium damages. *See Cohen I*, 238 F. Supp. 3d at 84 ("Solatium claims are typically brought by family members who were not present or injured themselves"); *id.* at 85 ("[B]ecause of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence of that they suffered mental anguish and trauma as a result of it") (citing *Braun*, 228 F. Supp. 3d at 81-83; *Ben–Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 56–57 (D.D.C. 2008)). An immediate family member who provides credible testimony about the effect on him or her of the attack is eligible for an award of solatium damages – provided that the relationship is sufficiently close. *See Moradi*, 77 F. Supp. 3d at 72-73 (declaration that victim's detention and torture caused claimant significant "mental anguish" supported awarding solatium damages consistent with framework of *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*")).

The courts in this Circuit have developed guidance outlining the considerations to be applied in determining the appropriate amount of solatium damages for family members of victims of terrorist attacks. These guidelines, and the dollar amounts applied in numerous decisions, help to foster equality of treatment among similarly situated victims of terrorism. *See Cabrera v. Islamic Republic of Iran*, No. 19-3835 (JDB), 2022 WL 2817730, at *48 (D.D.C. 2022) (emphasizing the importance of providing similar solatium awards to similarly situated plaintiffs). The values set forth in *Heiser I* and *Peterson II* provide the basic framework for the analysis of the appropriate solatium award. *Heiser I*, 466 F. Supp. 2d 269 (D.D.C. 2006); *Peterson II*, 515 F. Supp. 2d at 52. This framework provides a baseline for solatium damages for family members of

21

victims killed in a terrorist attack of $8 to $12 million for spouses, $5 million for parents and children, and $2.5 million for siblings. *See generally, Peterson II* at 47.

These amounts are guideposts – and they are neither mandatory nor applicable in all cases. *See Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361-62 (D.C. Cir. 2018).   The award should be determined with reference to the baseline framework values (which helps to assure consistency of outcome) taking into consideration the particular facts of each case. "Under the *Heiser* framework, a court begins with baseline amounts and may adjust upward or downward to account for individual circumstances." *Barry II*, 437 F. Supp. 3d at 53 (internal quotations omitted).   Courts have awarded both upward and downward adjustments from the baseline values. *See, e.g., Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 44 (D.D.C. 2012) (departing downward for a mother who had lost contact with her victim son for the sixteen years preceding his death). Conversely, courts typically have awarded higher amounts where the evidence shows more extreme or significant short and long-term effects on the family member. "An upward adjustment may be appropriate "in cases 'with aggravating circumstances,' indicated by such things as '[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence' or '[m]edical treatment for depression and related affective disorders.'" *Barry II*, 437 F. Supp. 3d at 54 (quoting *Valore*, 700 F. Supp. 2d at 85–86).

Each of the family member Plaintiffs in this case (or, as applicable, the appropriate representative of the Plaintiff) has submitted declaration and/or deposition testimony in support of their claims. Each of the family member Plaintiffs has established that they are an immediate family member of the victim who was killed in an attack that the Court has identified as meeting the requirements for liability under the state sponsor of terrorism exception to the FSIA.  I note in

particular that the testimony as a whole exhibits a very close and loving family – including minor children.

### B. Law Governing Solatium Damages – Non-U.S. National Plaintiffs

The Court has determined that Israeli law applies to the liability determination with respect to the three plaintiffs who are not U.S. Nationals. Memorandum Order on Default, Dkt. 52 at 30-32. The Court further found that the facts support a claim of negligence and intentional infliction of emotional distress under Israeli law and that the three plaintiffs have sufficiently alleged harm as a result of these legally cognizable claims. *Id*. at 32-35. Israeli law provides for damages for emotional distress provided that the emotional harm is documented and severe. *See Fraenkel v. Islamic Republic of Iran*, 248 F. Supp. 3d 21, 43 (D.D.C. 2017), clarified on denial of reconsideration, 258 F. Supp. 3d 77 (D.D.C. 2017), aff'd in part, rev'd in part sub nom. *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348 (D.C. Cir. 2018) ("Israeli law does not allow damages to secondary victims unless the harm is so severe that is disrupts daily function"). The uncontroverted testimony confirms that each of these Plaintiffs has experienced severe harm that has disrupted and forever altered their lives and that the Plaintiffs have suffered an irreparable loss and disruption of normal function. Accordingly, each of these plaintiffs is entitled to an award of damages for the intentional infliction of emotional distress – which is functionally the same as solatium damages. *Roth*, 78 F. Supp. 3d at 402.

Generally, such damages would be computed based on Israeli law. The record and documentation submitted does not include sufficient explanation of Israeli law to enable such a computation. Accordingly, under the law in this Circuit, it is appropriate to apply the *Heiser* standard in determining solatium damages. *See, e.g. Force*, 617 F. Supp. 3d at 36–37 ("Where this Court lacks information regarding the 'proper calculation' of solatium damages under foreign

law, it will 'default to the application of federal law.' *Fraenkel*, 892 F.3d at 358; *see also Thuneibat*, 167 F. Supp. 3d at 47 (applying the Section 1605A framework to damages where liability was established under Jordanian law); *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25–26 (D.D.C. 2011) ["(*Oveissi I*)"] (applying the federal standard for solatium damages where liability was established under French law). The Court will, accordingly, apply the same *Heisler I* framework to the Israeli citizens that it applies to the United States nationals.") Accordingly, I have provided recommended solatium awards for the three Israeli plaintiffs applying the *Heiser* framework and relevant case law.

### C. Pain and Suffering/Non-Economic Damages for Family Members of Pinches Przewozman.

Plaintiffs request solatium awards for each family member consistent with the baseline values set forth in the *Heiser* framework.  Based on the uncontroverted testimony of each individual plaintiff describing their grief and emotional injuries that in each case have had a significant effect on their ability to function, to maintain their normal activities, to engage with others, and to interact normally in society, the baseline awards are appropriate.  I note that Chaim Dov Przewozman and Chaya Rachel Przewozman testified that they continue to undergo treatment for their emotional injuries – treatment that includes therapy and medication.  In some circumstances, courts have concluded that the need for ongoing medication years after the loss of their family member warrants an enhancement to the baseline award.  *See, e.g.*, *Estate of Brown*, 872 F.Supp.2d at 43 (awarding an enhanced award of $3 million to the sister of the deceased victim where she "suffered a nervous breakdown ... for which she sought medical treatment and was

24

prescribed medication for approximately one year"). However, the Plaintiffs have not requested an enhanced award.

The claim of one family member – the child of Pinches Przewozman – requires additional consideration. The child was under 2 years age at the time of his father's death. Courts have applied different standards in determining the appropriate award for children who were very young at the time of their parent's death from a terrorist attack. Courts have not adopted a firm definition of a "very young" child – but the issue arises in cases involving a child (typically younger than 3) – who likely would be too young to remember the parent who was killed in the terror attack. Some decisions have reduced the compensation amount from the baseline when considering solatium damages for a very young child, concluding that such a child would not recall their life with the deceased parent and so would not consciously suffer a loss comparable to the loss experienced by an adult or older child. *See, e.g.*, *Martino v. Islamic Republic of Iran*, No. 1:21-cv-01808, Dkt. 91 at 8, *report and recommendation adopted in part and modified in part*, (D.D.C. 2025) (awarding four children under 3 years old $3 million each); *Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2024 WL 3225942, at *11 (D.D.C. 2024) ("The Court previously applied downward variances of 40% for children under the age of 1 and 30% for children between the ages of 1–3… and continued to apply those variances absent a showing that a particular plaintiff's relationship with the victim-parent was either stronger or weaker than expected.); *Akins v. Islamic Republic of Iran,* 332 F.Supp.3d 1, 43 (D.D.C. 2018) ("*Akins I*") (applying downward departure to plaintiff who was an infant at the time of the attack). Other courts have considered the totality of circumstances and the traumatic effect on a child growing up without a parent and in a household that has been affected by and continues to experience and exhibits grief and loss. *See, e.g. Ben-Rafael*, 540 F. Supp. 2d at 57-59 (awarding $5 million in solatium damages to each child of a slain

25

father, who were three years old and nine months old at the time of his murder, because of sense of loss of father figure and difficulty enjoying life).

Solatium damages are intended to address all types of loss resulting from the death of a family member including loss of guidance and companionship. Courts have recognized that these losses and the effect of the loss of a family member extends over multiple years and can affect the survivors for a lifetime. Children growing up in a household that has been so affected by the loss of a close family member experience emotional injury and suffering – regardless of the age of the child at the time of the family member's death. *Id*. at 49-50, 56-59; *see also Lee v. Islamic Republic of Iran*, No. 19-CV-00830 (APM), 2023 WL 8651039, at *4-5 (D.D.C. 2023) (internal quotations to Special Master Report omitted) *(*awarding $5 million to daughter who was two years old: "Ms. Vacho was only two years old when her father died. Growing up with a deceased parent was an emotionally and socially isolating experience. She missed SSG Vacho greatly on numerous milestones—when she was a cheerleader at football games, when she received her driver's license, and when she became an adult. Ms. Vacho keeps mementos from her father, including father, including a letter from him, his old hunting rifle, and his high school letterman jacket. Ms. Vacho finds the anniversary of her father's death particularly challenging, and she feels as though nothing can compensate for the loss of her father. Although Ms. Vacho was very young when SSG Vacho was killed, she is still entitled to baseline damages awards for children"); *see also Selig*, 573 F. Supp. 3d at 75 (awarding a 25 percent upward departure to a plaintiff who was a minor at the time of his father's killing "because courts have recognized the particularly devastating effect that the loss of a parent can have on minors") (citing *Oveissi I*, 768 F. Supp. 2d at 29); *Mark v. Islamic*

26

*Republic of Iran*, 626 F. Supp. 3d 16, 38 (D.D.C. 2022) (awarding enhancement because child "lost an irreplaceable provider, guide, and nurturer at a critical point in her young life").

Accordingly, in determining the amount of a solatium award for a young child, it is necessary to assess all factors, including the long-term effect on the child and on the family as a whole of the loss of a parent. In this case, the testimony is limited and indicates that the child asked for his father and is now growing up in a household without a father figure. There is no testimony or other evidence of a devastating long-term effect akin to the situations described above. Accordingly, and consistent with this Court's prior decisions, I recommend an award of $3 million for Y.P., the young child of Pinches Przewozman. *See Martino*, No. 1:21-cv-01808, Dkt. 91 at 8 (awarding $3 million to children of victims).

Based on the above factual findings and application of the pertinent case law, I recommend the following awards:

| Plaintiff | Relationship to Direct Victim | Award Amount |
|---|---|---|
| Hadassah Przewozman (Israeli Citizen) | Spouse | $8,000,000 |
| Chaim Dov Przewozman | Father | $5,000,000 |
| Chaya Rachel Przewozman (Israeli Citizen) | Mother | $5,000,000 |
| Y.P. (Israeli Citizen) | Child | $3,000,000 |
| Tzvi Yosef Przewozman | Sibling | $2,500,000 |
| Sara Przewozman-Rozenbaum | Sibling | $2,500,000 |

| Yafa Przewozman | Sibling | $2,500,000 |
| F.P. | Sibling | $2,500,000 |
| A.M.P. | Sibling | $2,500,000 |

### III.   PREJUDGMENT INTEREST

The plaintiffs requested an award of prejudgment interest in their complaint.  *See* Plaintiffs' Amended Complaint, Dkt No. 6, at 15-16.

"The decision to award prejudgment interest, as well as how to compute that interest, 'rests within the discretion of the court, subject to equitable considerations.'" *Fritz v. Islamic Republic of Iran*, No. 15-456, 324 F.Supp.3d 54, 63 (D.D.C. 2018) (quoting *Baker*, 775 F. Supp. 2d at 86); *see also Baker v. Islamic Republic of Iran*, No. 22-2765, 2025 WL 2480075, at *29 (D.D.C. 2025). Courts have differed regarding the propriety of pre-judgment interest in FSIA cases and courts have also differed as to the rationale for such awards and the types of damages to which such awards should apply.  *See, e.g.*, *Gunn v. Islamic Republic of Iran,* No.: 21-1187, 2024 WL 3566173, at *35 (D.D.C.  2024) ("'[c]ourts in this Circuit have split on whether an award of prejudgment interest on compensatory damages is appropriate in FSIA suits.") (quoting *Barry II*, 437 F. Supp. 3d at 60); *see also Doe A-1 v. Democratic People's Republic of Korea*, No. 18-CV-0252 (DLF), 2021 WL 723257, at *9 (D.D.C. 2021) ("Courts in this district have taken varying approaches to requests for prejudgment interest").

Prejudgment interest has generally been justified as a means of accounting for the delay in payment resulting from the litigation.  "Where courts have made such an award, they have generally justified it based on a delay between the time of the attack giving rise to the injury and the time at which the claimants received relief." *Barry II*, 437 F. Supp. 3d at 60 (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) (citing *Pugh*, 530 F. Supp. 2d

at 263 and *Baker*, 775 F. Supp.2d at 86)).  "'The purpose of such awards is to compensate the plaintiff for any delay in payment resulting from the litigation.'" *Fritz I*, 324 F. Supp. 3d at 63 (quoting *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997).  Further, "[f]ailure to award prejudgment interest 'would also allow the Iranian defendants to 'profit from the use of the money' in the intervening time." *Cabrera I*, 2022 WL 2817730, at *55 (quoting *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 250 (D.D.C. 2020)).  "Accordingly, '[p]rejudgment interest is an element of complete compensation.'" *Fritz I*, 324 F. Supp. 3d at 63 (quoting *Oveissi v. Islamic Republic of Iran*, 879 F.Supp.2d 44, 59 (D.D.C. 2012) (quoting *West Virginia v. United States*, 479 U.S. 305, 311-12 (1987)); s*ee also Estate of Fakhoury v. Islamic Republic of Iran*, No. 21-1218, 2025 WL 1262297, at *7 (D.D.C. 2025) ("This Court and several others in this District have previously awarded prejudgment interest on similarly situated plaintiffs' awards, including pain and suffering and solatium.' … Although there is some disagreement about this practice, … the Court concludes—as it has done in the past—that an award of prejudgment interest is appropriate, … A solatium award is … best viewed as fixed at the time of the activity, … and failing to award plaintiffs prejudgment interest would permit Iran to profit from the use of the money in the meantime") (citations omitted); *Adamkavicius v. Islamic Republic of Iran*, No. 23-3571, 2025 WL 2159537 at *31 (D.D.C. 2025) (awarding prejudgment since "[a]wards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks") (citation omitted); *Kinyua v. Republic of Sudan,* 466 F. Supp. 3d 1, 12 (D.D.C. 2020) ("'A solatium award is therefore best viewed as fixed at the time of the loss,' … and plaintiffs are entitled to the full amount of their award as if they received it [at the time of the loss]. Failing to do so would not only place the present plaintiffs at a disadvantage relative to their family members in earlier litigation, but would also allow the Iranian defendants 'to profit from the use of the money [since the time of the

29

attack]'") (quoting *Fritz I*, 324 F. Supp. 3d at 64 and *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013)).[8]

This Court has awarded prejudgment interest in FSIA cases.  In *Jakubowicz v. Islamic Republic of Iran,* this Court found no reason to revisit its prior conclusion that '""prejudgment interest was appropriate on both 'past economic loss' and on the 'non-economic pain and suffering and solatium damages suffered by the victims' estates and families.'"  No. CV 18-1450 (RDM), 2024 WL 1826610, at *3 (D.D.C. 2024) (quoting *Force*, 617 F. Supp. 3d at 42 (quoting *Fritz I*, 324 F. Supp. 3d at 64)); *see also Martino*, No. 1:21-cv-01808, Dkt. 91 at 12-13 (awarding plaintiffs prejudgment interest on their compensatory damages); *Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349, 2022 WL 1567358, at *5 (D.D.C. 2022) (awarding plaintiffs prejudgment interest on the solatium damages awarded to the families of the three victims); *Fritz v. Islamic Republic of Iran*, 466 F. Supp. 3d 13, 21 (D.D.C. 2020) ("*Fritz II*") (finding additional family member entitled to damages and following *Fritz I* in awarding prejudgment interest).

Conversely, as noted above, some courts in this Circuit have concluded that prejudgment interest is not appropriate because the "values set by" the general damages *Heiser I* framework that courts have applied "represent the appropriate level of compensation, regardless of the timing of the attack…".  *Barry II*, 437 F. Supp. 3d at 60 (citing *Oveissi I*, 768 F. Supp. 2d at 30 n.12); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012), aff'd, 554 F. App'x 16 (D.C. Cir. 2014) (declining to award prejudgment interest because the pain and suffering and solatium damages were designed to be fully compensatory in this case); *Gunn*, 2024 WL 3566173, at *35 (declining to award prejudgment interest because "the pain and suffering or solatium

---

[8] *See also Cabrera,* 2024 WL 4345784, at *6; *Sheikh*, 485 F. Supp. 3d at 274; *Christie v. Islamic Republic of Iran*, 2020 WL 3606273, at *19-20 (D.D.C. 2020).

damages should already account for any additional suffering during the delay between original injury and the damages award"); *Estate of Fouty v. Syrian Arab Republic*, No. 18-385, 2024 WL 4006166 at *26 (D.D.C. 2024) (collecting cases); *Baker*, 2025 WL 2480075, at *2 ("In FSIA cases, most Judges on this Court who have considered this issue have concluded…that 'pain and suffering and solatium damages are both designed to be fully compensatory' and prejudgment interest is therefore unwarranted as to those categories of damages.") (citations omitted)); *Burks v. Islamic Republic of Iran*, No. 16-cv-1102, 2026 WL 654349, at *9 (D.D.C. 2026) ("The Court maintains its belief that pre-judgment interest 'is not appropriate for nonpecuniary damages already designed to provide complete compensation.'") (internal citation omitted)); *Thuneibat*, 167 F. Supp. 3d 22, 54 (noting that solatium damages "do not typically require prejudgment interest because they are 'designed to be fully compensatory'") (internal citation omitted)); *Akins I*, 332 F. Supp. 3d at 45-46 (declining to award prejudgment interest because plaintiffs did not provide reasoning for why awards under the *Heiser* framework were warranted or why the solatium awards under the framework were insufficient to provide complete compensation); *Akins v. Islamic Republic of Iran*, 549 F.Supp.3d 104, 121-22 (D.D.C. 2021) ("*Akins II*") ("the majority of Judges confronted with this issue have concluded… that 'pain and suffering and solatium damages are both designed to be fully compensatory.'") (internal citation omitted) .

I have set forth the calculation of prejudgment interest on the recommended pain and suffering and solatium awards.  Prejudgment interest is calculated at the prime rate for each year from the date of attack using the methodology described in *Fritz I,* 324 F. Supp. 3d at 64, 67 n. 2; *see also Adamkavicius*, 2025 WL 2159537 at *31; *Jakubowicz*, 2024 WL 1826610, at *3; *Ewan*, 466 F. Supp. 3d at 250 n.3.[9]  A multiplier was calculated using the Federal Reserve's data for the

---

[9]  For 2026, I applied the current prime rate, and not a discounted six-year average that had been

average annual prime rate from the date of attack through May 15, 2026.  *See* Bd. of Governors of the Fed. Reserve Sys., Historical Data, available at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 (last accessed May 14, 2026).[10]

I multiplied $1.00 by the prime rate in year of the attack and then multiplied the resulting product by the percentage of the days of the year remaining as of the date of the attack. I then added that product to $1.00.  Next, I multiplied that amount by the prime rate the following year and added that amount.  I continued this iterative process through May 15, 2026, calculating interest on the days through May 15 and applying the current interest rate for 2026.  The calculation yields a multiplier of 1.496.  As the Court explained in *Wamai* and *Opati*, "[t]he product of the multiplier and the base damages amount includes both the prejudgment interest and the base damages amount; in other words, applying the multiplier calculates not the prejudgment interest but the base damages amount plus the prejudgment interest, or the total compensatory damages award."  *Wamai v. Republic of Sudan,* 60 F. Supp. 3d 84, 99 n 16 (D.D.C. 2014)*, aff'd in part, vacated in part sub nom. Owens*, 864 F.3d 751, vacated and remanded on other grounds by *Opati*, 140 S. Ct. 1601 (2020); *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 83 n. 12 (D.D.C. 2014), appeal dismissed and remanded, No. 14-7124, 2022 WL 1003610 (D.C. Cir. 2022).

---

described in *Ewan*.

[10] The rates applied are as follows (as applicable and tailored to each date of attack):
- 2019  5.28 (applied from the date of the attack)
- 2020  3.54
- 2021  3.25
- 2022  4.86
- 2023  8.20
- 2024  8.31
- 2025  7.37
- 2026  6.75 (current rate)

## SUMMARY OF RECOMMENDATIONS

| Plaintiff | Relation to Direct Victim | Pain and Suffering/Solatium Damages | Multiplier | Prejudgment Interest | Total with Prejudgment Interest |
|---|---|---|---|---|---|
| Estate of Pinches M. Przewozman | Direct Victim | $1,000,000 | 1.4960 | $495,954 | $1,495,954 |
| Chaim Dov Przewozman | Father | $5,000,000 | 1.4960 | $2,479,768 | $7,479,768 |
| Chaya Rachel Przewozman | Mother | $5,000,000 | 1.4960 | $2,479,768 | $7,479,768 |
| Hadassah Przewozman | Wife | $8,000,000 | 1.4960 | $3,967,629 | $11,967,629 |
| Y.P. | Minor Son | $3,000,000 | 1.4960 | $1,487,861 | $4,487,861 |
| A.M.P. | Minor Brother | $2,500,000 | 1.4960 | $1,239,884 | $3,739,884 |
| F.P. | Minor Sister | $2,500,000 | 1.4960 | $1,239,884 | $3,739,884 |
| Sara Przewozman-Rozenbaum | Sister | $2,500,000 | 1.4960 | $1,239,884 | $3,739,884 |
| Yafa Przewozman | Sister | $2,500,000 | 1.4960 | $1,239,884 | $3,739,884 |
| Tzvi Yosef Przewozman | Brother | $2,500,000 | 1.4960 | $1,239,884 | $3,739,884 |

Respectfully, submitted

Dated: May 14, 2026

By: */s/ Deboarh E. Greenspan*
Deborah E. Greenspan
Special Master

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2026, I electronically filed the foregoing document with the Clerk of the Court using the Court's ECF system, which will send notification of such filing to attorneys of record.

Dated: May 14, 2026

*/s/ Deborah E. Greenspan*
Deborah E. Greenspan
Special Master
BLANK ROME LLP
1825 Eye Street, N.W.
Washington, DC 20006
Telephone: (202) 420-2200
Facsimile: (202) 420-2201
Deborah.Greenspan@blankrome.com